IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-884

Filed:  2 August 2016

New Hanover County, No. 13 CVS 1073

VIRGINIA RADCLIFFE, Plaintiff,

v.

AVENEL HOMEOWNERS ASSOCIATION, INC., CARMELO (TONY) BUCCAFURRI, STEPHEN MURRAY, THOMAS DINERO, DAVID HULL, RICHARD PROGELHOF, and RON ZANZARELLA, Defendants.


Appeal by plaintiff and cross-appeal by defendants from orders entered 21 August 2014 and 4 February 2015 by Judge D. Jack Hooks, Jr. in New Hanover County Superior Court.  Heard in the Court of Appeals 13 January 2016.

*Hester, Grady & Hester, P.L.L.C., by H. Clifton Hester, for Virginia Radcliffe.*

*StephensonLaw, LLP, by James B. Stephenson II and Philip T. Gray, for Avenel Homeowners Association, Inc.*

*Ennis, Baynard, Morton, & Medlin, PA, by Donald W. Ennis, for Carmelo Buccafurri and Stephen Murray.*

*Crossley, McIntosh, Collier, Hanley & Edes, PLLC, by Clay Allen Collier, for Thomas Dinero.*

*Hedrick Gardner Kincheloe & Garofalo, LLP, by Reid Russell, and Brown, Crump, Vanore & Tierney, L.L.P., by Derek M. Crump, for David Hull.*

*Anderson, Johnson, Lawrence, & Butler, LLP, by Stacey E. Tally, for Richard Progelhof.*

*Hedrick Gardner Kincheloe & Garofalo, LLP, by Jeffrey H. Blackwell, for Ron Zanzarella.*

DAVIS, Judge.

Virginia Radcliffe ("Plaintiff") initiated this action alleging a violation of her civil rights and the infliction of various types of tortious conduct against her by the Avenel Homeowners Association, Inc. ("the Association"), Carmelo Buccafurri ("Buccafurri"), Stephen Murray ("Murray"), Thomas Dinero ("Dinero"), David Hull ("Hull"), Richard Progelhof ("Progelhof"), and Ron Zanzarella ("Zanzarella") (collectively "Defendants"). Plaintiff appeals from two orders of the trial court dismissing a number of the claims asserted by her in this action pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. After careful review, we (1) affirm the trial court's 21 August 2014 order; (2) reverse the portions of the trial court's 4 February 2015 order dismissing (a) Plaintiff's claims for intentional infliction of emotional distress against Buccafurri, Hull, Dinero, Progelhof, Zanzarella, and Murray; and (b) Plaintiff's tortious interference with prospective economic advantage claims (related to her prospective employment with the United Methodist Church) against Hull, Murray, Progelhof, and Zanzarella; and (3) remand for further proceedings.

**Factual and Procedural Background**

**I. Allegations of Plaintiff's Second Amended Complaint**

We have summarized below the allegations of Plaintiff's second amended complaint,[1] which we take as true in reviewing the trial court's Rule 12(b)(6) orders. *Feltman v. City of Wilson*, __ N.C. App. __, __, 767 S.E.2d 615, 617 (2014).

In March of 2001, Plaintiff moved to the Avenel subdivision ("Avenel") in New Hanover County, North Carolina in order to pursue a career with the United Methodist Church ("the UMC"). Plaintiff had prospects for employment with a local chapter of the UMC and was a certified candidate for ordination as a minister, having recently graduated from Yale Divinity School.

As a resident of Avenel, Plaintiff was required to join the Association and be subject to its covenants and restrictions. In return, Plaintiff was entitled to utilize certain common areas within Avenel, including a pier, a floating dock, a gazebo, an entrance driveway, and several parking lots.

During the time period in which Plaintiff lived in Avenel, the individual Defendants held various positions on the Association's board of directors. Three of the individual Defendants — Buccafurri, Murray, and Hull — were also Plaintiff's neighbors. Beginning in the spring of 2003, Defendants allegedly embarked on a campaign to force Plaintiff to leave Avenel and "engaged in a systemic pattern of

---

[1] Because of the numerous incidents of harassment described throughout Plaintiff's second amended complaint, we reference only a portion of them here as representative samples of her allegations. At various times throughout this opinion, we discuss other incidents alleged by Plaintiff.

harassment, threats, violence, and intimidation" designed to induce Plaintiff to move out of the subdivision.

On 27 March 2003, Plaintiff was walking on the street in front of her house when Zanzarella drove an SUV directly at her while Progelhof sat in the front passenger seat. Buccafurri and Murray confronted Plaintiff at the Avenel gazebo on or about 25 May 2003. They verbally berated her, stating that they (1) "had a plan to get rid of [her] or to cause her to leave Avenel"; (2) "were going to ruin [her] reputation and her career in Christian ministry"; (3) "would turn all of [her] friends against her"; (4) "would fix it so [she] could not walk the streets of Avenel unmolested"; (5) "would drive [her] into a depression so deep that she would commit suicide"; and (6) "would kill [her] to get her out of her house."

Hull and Progelhof on several occasions told Plaintiff that "they did not want a 'helpless female' living in the neighborhood." On 20 December 2003, Zanzarella yelled at her: "Hey you fat pig, you better get out of the neighborhood." On another occasion, Zanzarella, Dinero, Murray, and Buccafurri told Plaintiff to " '[e]at s*** and die[.]' " At one point, Hull also said to Plaintiff that "he could fix it so he could legally take her house away from her and there would be nothing she could do to stop him[.]" In addition, he uttered racial epithets towards her.

At one point in December of 2003, Buccafurri and Dinero shouted disparaging remarks at Plaintiff based on her religious beliefs while she was washing her car in

her driveway. That same day, Buccafurri, Dinero, and Murray strung Christmas lights on the bushes outside of Murray's and Buccafurri's home (facing Plaintiff's house) that "[w]hen illuminated . . . [were] about 20 feet long and 8 feet high and read WWJD (standing for What Would Jesus Do)." On one or more occasions, Plaintiff was told by various Defendants that "she was one of those 'born again' Christians who would bring other undesirable people into the Avenel community."

On 31 December 2003, Buccafurri accosted Plaintiff while she was walking in Avenel and chased her, yelling "I'm gonna kill you, you Christian B****." Plaintiff ran to a nearby neighbor's house and called the police.

On 24 February 2004, the Association held a meeting, which Plaintiff and some or all of the individual Defendants attended. During the meeting, Zanzarella shouted that "[Plaintiff] doesn't deserve to live in Avenel[.]" He and Murray then both yelled "[e]veryone thinks you are crazy" at Plaintiff. Murray shouted "[l]et's get rid of her" to the other attendees of the meeting. At that point, Zanzarella approached Plaintiff with clenched fists and had to be physically removed from the meeting space and taken to the parking lot.

On 8 April 2004, Murray cornered Plaintiff as she was walking on the pier by the Avenel boat facility. He made "crude, sexual, and violent gestures toward [her] while making threats." Murray proceeded to "beat [Plaintiff and] then shouted at [her] 'You'll never be a minister now' after he battered [her]." Murray threw Plaintiff

to the ground, kicked her, and jumped on her. Plaintiff was transported to a local hospital via ambulance where she was informed she needed surgery for broken ribs, torn knee ligaments, deep bruising, bone contusions, and other related injuries. That same day, Murray filed a lawsuit against her in which he falsely claimed she had assaulted and battered him.

On 29 May 2004, Buccafurri and Zanzarella accosted Plaintiff and a friend of hers at the Avenel gazebo, shouting obscenities and threats. They followed Plaintiff and her friend as they were walking back to her house, continuing to shout at and threaten her along the way.

On 23 June 2004, while Plaintiff was at the Avenel gazebo, Hull, Zanzarella, and Progelhof surrounded her and "physically prevented" her from leaving while shouting disparaging and threatening remarks at her. Plaintiff called 911 and received an escort home from law enforcement officers. The following day, Progelhof and Zanzarella instituted criminal proceedings against Plaintiff in which they falsely accused her of communicating threats. That same day, Buccafurri filed false charges against Plaintiff for trespass.

On 18 October 2004, Buccafurri and Murray shouted loudly at Plaintiff and her friend as they stood in Plaintiff's driveway. They "began waving their arms wildly and chased [Plaintiff] and her friend from [her] yard."

At some point in time, Buccafurri sent a packet of documents to UMC representatives containing false information about Plaintiff that was damaging to her reputation "in order to prevent [Plaintiff's] ordination[.]" The UMC did, in fact, revoke Plaintiff's ordination candidate certification on 2 February 2005.[2]

Plaintiff was also denied employment by the Boys and Girls Home of North Carolina ("Boys and Girls Home") — an organization that was a "local Christian ministry." Plaintiff had sought a position as a "mentor supervisor" at the Boys and Girls Home but was denied a job offer on 1 July 2005 due to the false criminal charges previously filed against her by Buccafurri, Progelhof, and Zanzarella. On 18 July 2005, Buccafurri accosted Plaintiff at a local grocery store and stated "that he would make sure she never got a job anywhere."

## II. Prior Lawsuits Brought by Plaintiff or on Her Behalf

On 14 June 2006, the North Carolina Human Relations Commission ("the NCHRC") brought a lawsuit ("the NCHRC Lawsuit") on Plaintiff's behalf in Wake County Superior Court asserting a cause of action against Defendants for interference with Plaintiff's civil rights in violation of N.C. Gen. Stat. § 99D-1. On 4 January 2007, the NCHRC lawsuit was voluntarily dismissed.

On 26 March 2007, Plaintiff filed a complaint in the United States District Court for the Eastern District of North Carolina ("the Federal Action") against all of

---

[2] An ordination certification is a prerequisite to becoming an ordained minister in the UMC.

the same individuals and entities named as Defendants in the present action. In her federal complaint, Plaintiff alleged claims for (1) violation of the Fair Housing Act ("FHA") against all Defendants; (2) interference with Plaintiff's civil rights pursuant to N.C. Gen. Stat. § 99D-1 against all Defendants; (3) assault and battery against Murray relating to the 8 April 2004 incident at the pier in which he physically beat her; (4) false imprisonment against Hull, Zanzarella, and Progelhof; (5) malicious prosecution against Murray, Progelhof, Zanzarella, and Buccafurri; (6) intentional infliction of emotional distress ("IIED") against the individual Defendants; (7) negligent infliction of emotional distress ("NIED") against all Defendants; and (8) tortious interference with a prospective economic advantage against Buccafurri, Murray, Hull, Progelhof, and Zanzarella.

All of the defendants filed motions for summary judgment, and on 12 February 2013, the Honorable James C. Fox entered an order granting summary judgment in favor of Defendants on Plaintiff's FHA claim. Having disposed of the only claim asserted by Plaintiff arising under federal law, Judge Fox expressly declined to rule on Plaintiff's supplemental state law claims and dismissed these claims without prejudice.

**III. The Present Lawsuit**

On 14 March 2013, Plaintiff initiated the present action in New Hanover County Superior Court. On 10 May 2013, Plaintiff filed her first amended complaint,

and she amended her complaint once more on 5 August 2013. In her second amended complaint, Plaintiff alleged the following causes of action: (1) IIED claims against all Defendants; (2) assault claims against Progelhof and Zanzarella related to the SUV incident occurring on 27 March 2003 in which Zanzarella drove his SUV directly at Plaintiff, causing her to run away ("the First SUV Incident"); (3) an assault claim against Zanzarella regarding the incident occurring on 2 June 2004 in which Zanzarella once again drove his SUV toward Plaintiff ("the Second SUV incident"); (4) an assault claim against Buccafurri based on the incident in which he chased her on 31 December 2003 ("the First Chasing Incident"); (5) assault claims against Buccafurri and Murray in connection with the incident in which they chased her on 18 October 2004 ("the Second Chasing Incident"); (6) assault claims against Buccafurri and Zanzarella for the incident occurring at the gazebo on 29 May 2004 where they yelled obscenities at Plaintiff and her friend and followed them home while continuing to verbally berate them ("the First Gazebo Incident"); (7) an assault claim against Murray regarding the incident at the pier on 8 April 2004 during which he physically beat her while simultaneously verbally berating her ("the Pier Incident"); (8) a battery claim against Murray for the Pier Incident; (9) assault claims against Hull, Zanzarella, and Progelhof for the incident at the gazebo on 23 June 2004 during which they prevented her from leaving, requiring her to call 911 for assistance ("the Second Gazebo Incident"); (10) false imprisonment claims against Hull,

Zanzarella, and Progelhof for the Second Gazebo Incident; (11) tortious interference with prospective economic advantage claims against all Defendants for interfering with her potential employment contract with the UMC; (12) tortious interference with prospective economic advantage claims against the Association, Buccafurri, Hull, Progelhof, and Zanzarella based on their interference with her potential employment with the Boys and Girls Home; (13) a malicious prosecution claim against Murray due to his filing of criminal charges against Plaintiff for assault and battery shortly after the Pier Incident; (14) a malicious prosecution claim against Progelhof based on his filing of a communicating threats charge against her on 24 June 2004; (15) a malicious prosecution claim against Zanzarella in connection with his filing on 24 June 2004 of a communicating threats charge against her; (16) a malicious prosecution claim against Buccafurri due to his filing of a trespass claim against her on 24 June 2004; (17) NIED claims against all Defendants; and (18) a claim under N.C. Gen. Stat. § 99D-1 against all Defendants alleging a violation of her civil rights.

On 6 September 2013, the Association filed an answer and motion to dismiss Plaintiff's second amended complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted and Rule 12(b)(7) based on Plaintiff's alleged failure to join a necessary party. The individual Defendants subsequently filed answers containing similar motions.

On 16 June 2014, a hearing was held before the Honorable D. Jack Hooks, Jr. On 21 August 2014, Judge Hooks entered an order denying Defendants' Rule 12(b)(7) motions and granting Defendants' motions to dismiss Plaintiff's claims under N.C. Gen. Stat. § 99D-1 pursuant to Rule 12(b)(6).

A second hearing was held before Judge Hooks on 25 September 2014. On 4 February 2015, Judge Hooks entered an order dismissing (1) Plaintiff's IIED claims; (2) all of her assault claims against Progelhof, Zanzarella, Buccafurri, and Hull and all but one of her assault claims against Murray; (3) Plaintiff's tortious interference with prospective economic advantage claims against all Defendants except for Buccafurri with regard to Plaintiff's potential employment with the UMC; (4) her tortious interference with prospective economic advantage claims in connection with her potential employment with the Boys and Girls Home; and (5) Plaintiff's NIED claims.

Plaintiff filed a notice of appeal as to both of Judge Hooks' orders on 5 March 2015. On 18 March 2015, Defendants filed a notice of cross-appeal as to the 21 August 2014 order.

## Analysis

## I. Appellate Jurisdiction

Initially, we must determine whether we have jurisdiction over Plaintiff's appeal and Defendants' cross-appeal. *See Hous. Auth. of City of Wilmington v. Sparks*

*Eng'g, PLLC*, 212 N.C. App. 184, 187, 711 S.E.2d 180, 182 (2011) ("As an initial matter, we must address the extent, if any, to which Defendant's appeal is properly before us. An appellate court has the power to inquire into jurisdiction in a case before it at any time, even *sua sponte*." (citation, quotation marks, and brackets omitted)).

On 15 October 2015, Defendants filed a joint motion to dismiss Plaintiff's appeal on the ground that it is an impermissible interlocutory appeal from orders that are not final judgments. For the reasons set out below, we deny Defendant's motion.

It is undisputed that the present appeal is interlocutory. *See Mecklenburg Cty. v. Simply Fashion Stores, Ltd.*, 208 N.C. App. 664, 667, 704 S.E.2d 48, 51 (2010) ("An order is interlocutory when it does not dispose of the entire case but instead, leaves outstanding issues for further action at the trial level."), *appeal dismissed and disc. review denied*, 365 N.C. 187, 707 S.E.2d 231 (2011). Generally, there is no right of immediate appeal from an interlocutory order. *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). "An interlocutory order may be appealed, however, if the order implicates a substantial right of the appellant that would be lost if the order was not reviewed prior to the issuance of a final judgment."[3] *Keesee v.*

---

[3] An interlocutory order may also be appealed where the trial court certifies the order for immediate appeal pursuant to Rule 54(b). *See Tands, Inc. v. Coastal Plains Realty, Inc.*, 201 N.C. App. 139, 142, 686 S.E.2d 164, 166 (2009) ("[A]n interlocutory order can be immediately appealed if the

*Hamilton*, __ N.C. App. __, __, 762 S.E.2d 246, 249 (2014). It is the appealing party's burden to establish that a substantial right would be jeopardized unless an immediate appeal is allowed. *Embler v. Embler*, 143 N.C. App. 162, 166, 545 S.E.2d 259, 262 (2001).

Our caselaw makes clear that a substantial right is affected "where a possibility of inconsistent verdicts exists if the case proceeds to trial." *Heritage Operating, L.P. v. N.C. Propane Exch., LLC*, __ N.C. App. __, __, 727 S.E.2d 311, 314 (2012) (citation and quotation marks omitted).

> To demonstrate that a second trial will affect a substantial right, [the appellant] must show not only that one claim has been finally determined and others remain which have not yet been determined, but that (1) the same factual issues would be present in both trials *and* (2) the possibility of inconsistent verdicts on those issues exists.

*Id.* at __, 727 S.E.2d at 314-15 (citation, quotation marks, and brackets omitted).

We have further held that "so long as a claim has been finally determined, delaying the appeal of that final determination will ordinarily affect a substantial right *if* there are overlapping factual issues between the claim determined and any claims which have not yet been determined." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 168, 684 S.E.2d 41, 47 (2009) (citation and quotation marks omitted). "Issues

---

order is final as to some but not all of the claims and the trial court certifies there is no just reason to delay the appeal pursuant to North Carolina Rules of Civil Procedure, Rule 54(b)." (citation, brackets, and ellipses omitted)). However, in the present case, neither of the trial court's orders contain any such certification.

are the 'same' if facts relevant to their resolution overlap in such a way as to create a risk that separate litigation of those issues might result in inconsistent verdicts." *Hamilton v. Mortg. Info. Serv., Inc.*, 212 N.C. App. 73, 79, 711 S.E.2d 185, 190 (2011).

We are satisfied that Plaintiff has sufficiently alleged a common factual nexus between all of her claims such that there exists a possibility of inconsistent verdicts absent immediate appeal of the trial court's orders. *See Carcano*, 200 N.C. App. at 168, 684 S.E.2d at 47 ("Because there are overlapping factual issues, inconsistent verdicts could result. We hold, thus, that . . . plaintiff's appeal is properly before us.").

Defendants also argue that Plaintiff's appeal from the trial court's 21 August 2014 order is time-barred. As a result, Defendants contend, the portion of her appeal arising from that order must be dismissed.

Plaintiff filed a notice of appeal on 5 March 2015 that referenced both of the trial court's orders. Therefore, while her appeal of the 4 February 2015 order was timely, her notice of appeal as to the 21 August 2014 order was filed well beyond the applicable thirty-day deadline. *See* N.C.R. App. P. 3(c) ("In civil actions and special proceedings, a party must file and serve a notice of appeal . . . within thirty days after entry of judgment if the party has been served with a copy of the judgment within the three day period prescribed by Rule 58 of the Rules of Civil Procedure[.]").

However, because of the factually overlapping nature of Plaintiff's claims, we elect in the interest of judicial economy to exercise our discretion under Rule 21 of

the North Carolina Rules of Appellate Procedure and treat Plaintiff's appeal of the trial court's 21 August 2014 order as a petition for *certiorari*. *See Carolina Bank v. Chatham Station, Inc.*, 186 N.C. App. 424, 428, 651 S.E.2d 386, 389 (2007) ("[B]ecause the case *sub judice* is one of those exceptional cases where judicial economy will be served by reviewing the interlocutory order, we will treat the appeal as a petition for a writ of certiorari and consider the order on its merits."); *In re I.S.*, 170 N.C. App. 78, 84, 611 S.E.2d 467, 471 (2005) ("Failure to comply with the requirements of Rule 3 of our Rules of Appellate Procedure requires the dismissal of the appeal as this rule is jurisdictional. However, under appropriate circumstances this Court is authorized to issue a writ of certiorari to review the orders of a trial tribunal when the right of appeal has been lost due to failure to take timely action. This Court can exercise its discretion and treat an appellant's appeal as a petition for a writ of certiorari." (internal citations omitted)).

Defendant's cross-appeal — which is based entirely on the trial court's 21 August 2014 order denying their motions to dismiss under Rule 12(b)(7) — is also interlocutory. The trial court's order was not certified for immediate appeal pursuant to Rule 54(b), and Defendants have failed to show a substantial right that would be lost if they had to wait until entry of a final judgment to appeal the denial of their Rule 12(b)(7) motions.

Nevertheless, in furtherance of the principles of equity and fairness to the parties, we elect to similarly treat Defendant's cross-appeal as a petition for *certiorari* and consider the merits of the cross-appeal. Therefore, we proceed to address the merits of both Plaintiff's appeal and Defendants' cross-appeal.

## II. Plaintiff's Appeal

The only claims left undisturbed by the trial court's 21 August 2014 and 4 February 2015 orders are Plaintiff's (1) assault claim against Murray in connection with the Pier Incident; (2) battery claim against Murray in connection with the Pier Incident; (3) false imprisonment claims against Progelhof, Hull and Zanzarella related to the Second Gazebo Incident; (4) tortious interference with prospective economic advantage claim against Buccafurri relating to her potential employment with the UMC; and (5) malicious prosecution claims against Murray, Progelhof, Zanzarella, and Buccafurri.[4] On appeal, Plaintiff contends that the trial court's dismissal of her remaining claims constituted error.

> The standard of review of an order granting a Rule 12(b)(6) motion is whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true. On appeal, we review the pleadings *de novo* to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct.

---

[4] The question of whether the trial court properly denied Defendants' motions to dismiss these claims pursuant to Rule 12(b)(6) is not before us in this appeal.

*Feltman*, __ N.C. App. at __, 767 S.E.2d at 619 (citation omitted). "Dismissal is proper when one of the following three conditions is satisfied: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Podrebarac v. Horack, Talley, Pharr, & Lowndes, P.A.*, 231 N.C. App. 70, 74, 752 S.E.2d 661, 663 (2013) (citation omitted).

**A. Applicability of Statute of Limitations to Plaintiff's Claims**

Before we discuss Plaintiff's specific claims for relief, it is necessary to address the threshold issue of whether the running of the statute of limitations has been tolled or otherwise rendered inapplicable to Plaintiff's claims. The specific incidents set out in Plaintiff's second amended complaint all occurred approximately nine years before the present action was filed. Defendants contend on appeal that many of Plaintiff's claims were properly dismissed as time barred.

All Defendants asserted the statute of limitations as an affirmative defense in their answers. It is well established that

> [o]nce a defendant has properly [pled] the statute of limitations, the burden is then placed upon the plaintiff to offer a forecast of evidence showing that the action was instituted within the permissible period after the accrual of the cause of action.

*Waddle v. Sparks*, 331 N.C. 73, 85-86, 414 S.E.2d 22, 28-29 (1992) (citation and quotation marks omitted).

Plaintiff asserts that the statute of limitations defense is inapplicable in this case based on two theories. First, she attempts to invoke the continuing wrong doctrine. Second, she contends that the running of the applicable limitations periods for her claims was tolled by virtue of her filing the Federal Action. We discuss each of these arguments in turn.

With regard to the continuing wrong doctrine, our Supreme Court has recognized this

> doctrine as an exception to the general rule that a claim accrues when the right to maintain a suit arises. For the continuing wrong doctrine to apply, the plaintiff must show a continuing violation by the defendant that is occasioned by continual unlawful acts, not by continual ill effects from an original violation. Courts view continuing violations as falling into two narrow categories. One category arises when there has been a long-standing policy of discrimination. In the second continuing violation category, there is a continually recurring violation.

*Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 292, 727 S.E.2d 1, 7 (2012) (internal citations, quotation marks, and ellipses omitted), *disc. review denied*, 366 N.C. 570, 738 S.E.2d 373 (2013).[5] We do not believe that either of these categories applies here.

---

[5] "Under the continuing wrong doctrine, the statute of limitations does not start running until the violative act ceases." *Marzec v. Nye*, 203 N.C. App. 88, 94, 690 S.E.2d 537, 542 (2010) (citation and quotation marks omitted).

First, Plaintiff was not subjected to a longstanding policy of discrimination for purposes of the doctrine. While her second amended complaint alleges insulting language and threats referencing her religion and gender that were made by Defendants, Judge Fox's order in the Federal Action — as discussed below — expressly rejected Plaintiff's argument that the tortious conduct she alleged was motivated by discrimination based on her gender or religious beliefs. While Plaintiff contends that the wrongful acts giving rise to this action all derive from Defendants' common scheme to force her to leave Avenel, we do not believe this allegation is sufficient to invoke the continuing wrong doctrine.

Nor does the second category of conduct referred to in *Birtha* apply here. Plaintiff has alleged the commission of various intentional torts by Defendants as opposed to a series of separate obligations all stemming from the same original contractual — or other — legal obligation. *See Marzec v. Nye*, 203 N.C. App. 88, 94-95, 690 S.E.2d 537, 542 (2010) (failure to make each successive monthly salary payment as it became due following defendant's breach of original payment obligation constituted new continuing wrong); *Babb v. Graham*, 190 N.C. App. 463, 481, 660 S.E.2d 626, 637 (2008) (trustee's recurring refusal to make distributions under trust constituted continuing wrong), *disc. review denied*, 363 N.C. 257, 676 S.E.2d 900 (2009).

Therefore, the continuing wrong doctrine is inapplicable to the present case. *See Morrison-Tiffin v. Hampton*, 117 N.C. App. 494, 499-500, 451 S.E.2d 650, 655 (finding "no evidence to support the application of the continuing wrong doctrine" where plaintiffs alleged violation of constitutional rights under 42 U.S.C. § 1983 based on several years of sexual harassment and discrimination by defendant (internal citations and quotation marks omitted)), *appeal dismissed and disc. review denied*, 339 N.C. 739, 454 S.E.2d 654 (1995).

With regard to Plaintiff's tolling argument, this Court has recently addressed the application of tolling principles to situations where a plaintiff's state court action is filed following a federal court's dismissal without prejudice of the plaintiff's state law claims in a federal lawsuit arising out of the same nucleus of facts.

> According to 28 U.S.C. § 1367(d), the period of limitations for any supplemental state law claim asserted in a federal action . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period. As a result of the fact that North Carolina does not provide for a longer tolling period than the thirty day interval specified in 28 U.S.C. § 1367(d), this Court has interpreted 28 U.S.C. § 1367(d) to provide that, in the event that the statute of limitations applicable to a plaintiff's state law claim expires while a federal action in which that claim has been asserted is pending, the plaintiff has thirty days following the dismissal of the federal action to reassert his or her state law claims in the General Court of Justice.

*Glynne v. Wilson Med. Ctr.*, __ N.C. App. __, __, 762 S.E.2d 645, 649 (2014) (internal citations, quotation marks, brackets, and ellipses omitted).[6]

The tolling provision of 28 U.S.C. § 1367(d), however, applies only to state law claims that were actually asserted in a federal lawsuit. It does *not* apply to claims arising out of the same set of facts that could have been brought in the federal lawsuit but were not. Instead, the statute of limitations for such claims continues to run during the pendency of the federal action.

Our decision in *Renegar v. R.J. Reynolds Tobacco Co.*, 145 N.C. App. 78, 549 S.E.2d 227, *disc. review denied*, 354 N.C. 220, 554 S.E.2d 344 (2001) is instructive. In *Renegar*, the plaintiff was fired from his job with the defendant. He brought several federal claims against the defendant in federal court as a result of the termination of his employment. *Id.* at 78-79, 549 S.E.2d at 229. He later voluntarily dismissed the federal action without prejudice and then filed a lawsuit in North Carolina superior court for wrongful discharge in violation of public policy — a claim arising under State law. The trial court granted summary judgment in favor of the defendant on statute of limitations grounds. The court reasoned that because the plaintiff had failed to assert his wrongful discharge claim as a supplemental claim in his federal action, the limitations period for that claim had not been tolled during the pendency of the federal action. *Id.* at 79, 549 S.E.2d at 229.

---

[6] Here, Judge Fox dismissed Plaintiff's state law claims without prejudice on 12 February 2013 and Plaintiff filed her initial complaint in the present action on 14 March 2013 — exactly 30 days later.

On appeal, we affirmed the trial court's ruling, holding that

> the claims set forth in plaintiff's federal and state actions arose from the same event, his discharge by [the defendant]. However, the claim of wrongful discharge alleged in the state action and the federal statutory and constitutional claims alleged in the federal action each constitute independent causes of action with unique elements which must be proven by plaintiff, and [the defendant] thus was not placed on notice by plaintiff's federal action that it would be asked to defend plaintiff's state wrongful discharge claim within the time required by the statute of limitations. In short, plaintiff's state action thus was not based on the same claims alleged in his federal action. . . . [Therefore, the p]laintiff's state action . . . was not timely filed, and the trial court properly granted summary judgment in favor of [the defendant].

*Id.* at 85, 549 S.E.2d at 232-33 (internal citations, quotation marks, and brackets omitted).

Thus, the limitations period for any claim that Plaintiff is asserting in the present action against a particular Defendant that she also asserted against that Defendant in the Federal Action was tolled until thirty days after the Federal Action was dismissed. However, such tolling would *not* apply to any claims asserted by Plaintiff in the present action against a particular Defendant that were not brought in the Federal Action. Furthermore, because (1) the Federal Action was not filed until 26 March 2007; and (2) all of Plaintiff's tort claims are governed by a three-year

statute of limitations, only claims for relief based on acts that occurred on or after 26 March 2004 would not be time barred.[7]

## B. Plaintiff's Claims

With these principles in mind, we next consider whether those claims in Plaintiff's second amended complaint dismissed by the trial court were properly subject to dismissal.

### 1. Claims under N.C. Gen. Stat. § 99D-1

We first address Plaintiff's argument that the trial court erred in dismissing her claim under N.C. Gen. Stat. § 99D-1. Defendants contend that the dismissal of this claim was proper based on collateral estoppel. We agree.

The doctrine of collateral estoppel prevents issues that were actually litigated and necessary to the outcome of a prior suit from being relitigated in a later action between the original parties or their privies. *Hedgepeth v. Parker's Landing Prop. Owners Ass'n, Inc.*, __ N.C. App. __, __, 762 S.E.2d 865, 871 (2014). The party alleging collateral estoppel must demonstrate

> that the earlier suit resulted in a final judgment on the merits, that the issue in question was identical to an issue actually litigated and necessary to the judgment, and that both the party asserting collateral estoppel and the party against whom collateral estoppel is asserted were either parties to the earlier suit or were in privity with parties.

---

[7] As discussed throughout the remainder of this opinion, we conclude that the statute of limitations does, in fact, bar a number of the claims Plaintiff has asserted in this action.

*Tucker v. Frinzi*, 344 N.C. 411, 414, 474 S.E.2d 127, 128-29 (1996) (citation and brackets omitted). Collateral estoppel only applies to "matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *City of Asheville v. State*, 192 N.C. App. 1, 17, 665 S.E.2d 103, 117 (2008) (citation, quotation marks, and emphasis omitted), *appeal dismissed and disc. review denied*, 363 N.C. 123, 672 S.E.2d 685 (2009).

N.C. Gen. Stat. § 99D-1 provides, in pertinent part, as follows:

> (a) It is a violation of this Chapter if:
>
> > (1) Two or more persons, motivated by race, religion, ethnicity, or gender, but whether or not acting under color of law, conspire to interfere with the exercise or enjoyment by any other person or persons of a right secured by the Constitutions of the United States or North Carolina, or of a right secured by a law of the United States or North Carolina that enforces, interprets, or impacts on a constitutional right; and
> >
> > (2) One or more persons engaged in such a conspiracy use force, repeated harassment, violence, physical harm to persons or property, or direct or indirect threats of physical harm to persons or property to commit an act in furtherance of the object of the conspiracy; and
> >
> > (3) The commission of an act described in subdivision (2) interferes, or is an attempt to interfere, with the exercise or enjoyment of a right, described in subdivision (1), of another person.

N.C. Gen. Stat. § 99D-1(a) (2015). Therefore, § 99D-1 expressly provides that in order for a claim to arise thereunder, the defendant's conduct must be motivated by either a racial, religious, ethnic, or gender-based discriminatory animus.

In the Federal Action, Judge Fox dismissed Plaintiff's FHA claim based on the following reasoning:

> In this case, Plaintiff asserts direct evidence of discrimination. However, for over a year before any of the complained of behavior occurred, Plaintiff and her neighbors tolerated, and in some instances were friendly with, one another. Then, on or after December 2, 2002, the relationships soured and the above-described feud ensued. It is abundantly clear that much animosity existed between Plaintiff and Defendants. Further, it may well be that, because of their quarrel with Plaintiff, some derogatory gender-specific, religious-specific, and disability-specific comments were made by one or more Defendants. However, the evidence contained in the record demonstrates that these comments were made, not because Defendants were intentionally discriminating against women, Christians, or disabled persons, or retaliating against Plaintiff for filing a discrimination claim, but rather because they knew such comments would personally offend Plaintiff. In this case, the prior amicable relationships, the several individuals in Avenel similarly situated to Plaintiff but not harassed, and the fact that some Defendants, rather than Plaintiff, have since moved from their homes, belie the contention of Plaintiff that the actions of Defendants were motivated by illegal discrimination or retaliation. As such, the Court finds that Plaintiff's evidence is insufficient for a reasonable jury to conclude that the hostility was a product of genuine discriminatory or retaliatory animus rather than the kind of personality conflict that exists in neighborhoods across the country. Accordingly, Plaintiff cannot prove the third and fourth elements of her FHA claim. The Court will

therefore grant Defendants' motions for summary judgment with regard to Plaintiff's claim under the FHA.

In *McCallum v. N.C. Co-op. Extension Serv. of N.C. State Univ.*, 142 N.C. App. 48, 542 S.E.2d 227, *appeal dismissed and disc. review denied*, 353 N.C. 452, 548 S.E.2d 527 (2001), the plaintiff brought retaliatory discharge and equal protection claims against the defendants based on the United States Constitution, claims for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, and a claim alleging violation of his rights under several provisions of the North Carolina Constitution. The defendants removed the case to federal court and later moved for summary judgment. *Id.* at 49, 542 S.E.2d at 230.

The federal court granted summary judgment on all claims arising under federal law and dismissed without prejudice the claims alleging violations of the North Carolina Constitution. In its order, the federal court ruled that the plaintiff had failed to show any discriminatory intent by the defendants. *Id.* at 49-50, 542 S.E.2d at 230.

Approximately one month later, the plaintiff filed a new complaint in North Carolina superior court in which he once again alleged that his discharge had been based on discrimination and retaliation in violation of the North Carolina Constitution. The defendants moved for summary judgment, contending that these claims were barred by collateral estoppel because of the federal court's ruling. The trial court denied the motion and defendants appealed. *Id.* at 50, 542 S.E.2d at 230.

In reversing the trial court, we held as follows:

> In the instant case, the issue of whether defendants intentionally discriminated against plaintiff was fully litigated in the federal court. After reviewing all of the evidence, the federal court found that plaintiff failed to present any direct evidence of a purpose by defendants to discriminate against plaintiff or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact. The federal court then granted defendants' motion for summary judgment on plaintiff's claim for racial discrimination. We hold that the issue of discriminatory intent by defendants was conclusively determined in the federal court, and thus plaintiff is collaterally estopped from re-litigating that issue in this action.
>
> Plaintiff's failure in federal court to establish discriminatory intent by defendants also bars litigation of his equal protection violation claim in state court. In order to prevail upon an equal protection violation claim under the North Carolina Constitution, the burden is upon the complainant to show the intentional, purposeful discrimination upon which he relies. As the federal court has already conclusively ruled against plaintiff upon the issue of discriminatory intent by defendants, collateral estoppel prevents the plaintiff from proceeding on this claim.
>
> . . . .
>
> [T]he federal court ruled against plaintiff on the exact issue that plaintiff now raises in state court. Plaintiff is therefore collaterally estopped from seeking a state court resolution on the issue of a causal connection between plaintiff's constitutionally protected activities and the adverse employment action taken by defendants. Because the lack of a causal connection is fatal to plaintiff's claim for retaliatory discharge, defendants are entitled to summary judgment on this claim.

> The issues of defendants' discriminatory intent and improper motivation were tried in the federal court after full discovery; resolution of those issues was material and necessary to the judgment in that court. The doctrine of collateral estoppel therefore bars the re-litigation of these issues in our state trial courts. Because plaintiff cannot, as a matter of law, succeed on his claims, the trial court erred when it refused to grant defendants' motion for summary judgment on plaintiff's claims of racial discrimination, equal protection violations, and retaliatory discharge.

*Id.* at 54-56, 542 S.E.2d at 233-34 (internal citation, quotation marks, and brackets omitted).

Plaintiff's § 99D-1 claims in the present case are based upon the same facts and circumstances that were before the federal court in its consideration of her FHA claims. Therefore, we conclude that the issue of whether Plaintiff was discriminated against by Defendants based upon her religious beliefs or gender has already been fully determined in the Federal Action and decided adversely to her. Accordingly, we hold that Plaintiff is collaterally estopped from asserting her § 99D-1 claims in the present action and that the trial court correctly dismissed these claims.

**2. IIED Claims**

Plaintiff next contends that the trial court erred in dismissing her claims for IIED against all Defendants. "The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Holleman v. Aiken,* 193 N.C. App. 484, 501, 668 S.E.2d 579, 590 (2008) (citation and quotation marks omitted). "The tort may

also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981).

"Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. The determination of whether conduct rises to the level of extreme and outrageous is a question of law." *Johnson v. Colonial Life & Acc. Ins. Co.*, 173 N.C. App. 365, 373, 618 S.E.2d 867, 872-73 (2005) (internal citations and quotation marks omitted), *disc. review denied*, 360 N.C. 290, 627 S.E.2d 620 (2006).

### a. The Association

In the Federal Action, Plaintiff did not assert an IIED claim against the Association and, therefore, based on the tolling principles discussed above, her deadline for asserting this claim against the Association was not tolled. "The statute of limitations for [an] intentional infliction of [emotional] distress [claim] is three years." *Waddle*, 331 N.C. at 85, 414 S.E.2d at 28. Accordingly, because the present action was not filed until 2013, her IIED claim against the Association is barred by the statute of limitations. *See Renegar*, 145 N.C. App. at 85, 549 S.E.2d at 232-33.

### b. Buccafurri, Dinero, Hull, Progelhof, Zanzarella, and Murray

Plaintiff's IIED claims against Buccafurri, Dinero, Hull, Progelhof, Murray, and Zanzarella were, conversely, tolled during the pendency of the Federal Action because these claims were asserted by Plaintiff in that lawsuit. As a result, we must determine whether Plaintiff has stated viable IIED claims against these individual Defendants based on acts alleged by her to have been committed on or after 26 March 2004.

After carefully reviewing the allegations contained in her pleadings, we conclude that Plaintiff has, in fact, pled valid claims for IIED against each of the individual Defendants. Even excluding from our consideration her references to conduct by these Defendants occurring prior to 26 March 2004, she has alleged a virtually unending barrage of abuse, harassment, threats, scorn, and derision heaped upon her by these Defendants — acts that at times spilled over into physical confrontation and attack — lasting until June 2006. Her allegations in support of her IIED claims include the following:

- Buccafurri, Murray, Dinero, Hull, Progelhof and Zanzarella habitually threatened, harassed, and intimidated Plaintiff. Murray, Buccafurri, Zanzarella, and Dinero shouted at Plaintiff that "she was a Christian B\*\*\*\* and a Christian C\*\*\*" and "threatened [her] by saying [w]hat would Jesus do if we screwed your Christian C\*\*\*" and "what would Jesus do if we sodomized you[?]"

- Murray, Buccafurri, Zanzarella, Dinero, Progelhof, and Hull told Plaintiff she "was one of those 'born again' Christians who would bring other undesirable people into the Avenel community[.]"

- Murray, Buccafurri, Zanzarella, Dinero, Progelhof, and Hull "threatened [Plaintiff] not to bring her African-Americans or low-income friends and associates from Christian Ministries into Avenel because they did not want those kind of people in Avenel[.]"

- Zanzarella, Dinero, Murray, and Buccafurri shouted at her to "[e]at s*** and die[.]"

- On one occasion while Plaintiff was walking her dog, Zanzarella and Hull shouted: "Look there is a pig walking a dog[.]"

- Murray and Buccafurri told her "she better lose weight in a hurry and marry an already married white male friend of hers or else[.]"

- At one point, Hull told Plaintiff "he could fix it so he could legally take her house away from her and there would be nothing she could do to stop him[.]" On another occasion, he uttered racial epithets at Plaintiff and "asked if she was going to marry an African-American male who was at that time a guest at [her] home[.]"

- Buccafurri mocked Plaintiff at one point by asking her "if she would still have large breasts if she lost weight[.]" On another occasion he "followed [Plaintiff] inside a grocery store yelling loudly, 'I'll keep on making sure you never get a job anywhere!'"

- Defendants charged Plaintiff with false crimes five times over a two year period.

- On or about April 8, 2004 Murray physically beat Plaintiff and then shouted at her "[y]ou'll never be a minister now[.]" Plaintiff was then transported to the hospital via ambulance where she was informed her injuries would require surgery.

- On 23 June 2004, while Plaintiff was sitting at the Avenel gazebo, Hull, Zanzarella, and Progelhof surrounded her, thereby physically preventing her from leaving, while simultaneously shouting insults and threats at her. Plaintiff was forced to call 911 as a result and be escorted home by law enforcement officers.

■ On 18 October 2004, Defendants saw Plaintiff meeting a friend for coffee. While they were having coffee, Defendants "placed a dismembered doll on the car belonging to Plaintiff's friend. [Plaintiff] and her friend were standing in [her] driveway discussing the dismembered doll when Defendants Buccafurri and Murray shouted at them. Defendants Buccafurri and Murray taunted and chased [Plaintiff] and her friend from [Plaintiff's] yard. [Plaintiff] and her friend were forced to drive away."

■ On 13 February 2005, Plaintiff returned home from church to find her back door — which had been bolted and locked — open. Upon inspection, she observed that "[s]omeone had written inside of her large picture window by the open door, the letters 'MUR.' [Her] private detective showed her a videotape that shows Defendant Murray running across her back property on this same day[.]"

■ On 18 July 2005, Buccafurri accosted Plaintiff at a local grocery store, threatened her, and told her that he would make sure she never got a job anywhere.

■ Zanzarella drove by Plaintiff on another occasion and "called [her] a b**** and shouted at her to '[g]et out of the neighborhood.' "

■ At one point "Hull accosted [her] at her home and told her she should move because he did not want a 'helpless female' with medical problems living alone next door to him."

■ Murray contacted Plaintiff's former husband and requested any information he possessed regarding her that could be used to blackmail her into leaving Avenel.

■ On 2 April 2006, while Plaintiff was sitting at the gazebo, Zanzarella accosted Plaintiff and screamed at her. Hull subsequently told Plaintiff that "the authorities would not help [her] because he was a close personal friend of the New Hanover County district attorney and sheriff."

■ Buccafurri sent a package of documents to UMC officials containing false information about her in order to prevent her ordination.

In analyzing the validity of her IIED claims, we are guided by our decision in *Wilson v. Pearce*, 105 N.C. App. 107, 412 S.E.2d 148, *disc. review denied*, 331 N.C. 291, 417 S.E.2d 72 (1992). In *Wilson*, the plaintiffs brought an IIED claim against their next door neighbors, Carl and Wanda Pearce. The defendants, who believed that the plaintiffs' fence was impermissibly encroaching on their property, engaged in a campaign of harassment for several years in an attempt to cause the plaintiffs to move the fence. *Id.* at 110-11, 412 S.E.2d at 149-50.

The plaintiffs presented evidence at trial of the following acts by the defendants: (1) Mr. Pearce would stand in his yard and raise his fists at Plaintiffs while making obscene gestures and loudly cursing at them; (2) Mr. Pearce frequently stood in front of his window in full view of Mrs. Wilson and "made obscene gestures with his 'private parts' at her and then laughed at her reaction" while simultaneously mouthing obscene words; (3) "[the d]efendants have for several years piled firewood against the Wilsons' fence to the point that the firewood is taller than the fence and bulges the fence into the Wilsons' yard" despite the fact that the defendants did not own a fireplace; (4) Mr. Pearce threw broken glass into the plaintiffs' yard; (5) the defendants filed false police reports against the plaintiffs; (6) Mr. Pearce threatened to kill Mr. Wilson by "knock[ing] his god damned brains out" with a rock; (7) Mr. Pearce fired his handgun past Mr. Wilson into his yard; and (8) the defendants

regularly left their lawnmower running outside of the plaintiffs' bedroom window at 6:00 a.m. in the morning. *Id.* at 115-16, 412 S.E.2d at 152-53.

On appeal, we summarized the plaintiffs' evidence as follows: "Generally, defendants . . . cursed and threatened plaintiffs, reported them to the City of Durham for untrue and alleged violations of city ordinances, threw items into plaintiffs' yard, made obscene gestures to plaintiffs and their children and generally disturbed their peace." *Id.* at 111, 412 S.E.2d at 150. We proceeded to

> hold that the above behaviors by the Pearces are extreme and outrageous conduct which intentionally or recklessly caused severe emotional distress to Mr. (and Mrs.) Wilson. . . . No one in a civilized society should be expected to take the kind of harassment the evidence shows the Pearces have forced upon the Wilsons . . . .

*Id.* at 117, 412 S.E.2d at 153.

We believe the alleged acts of Buccafurri, Dinero, Hull, Progelhof, Murray, and Zanzarella in the present case are analogous to the defendants' conduct in *Wilson*. Plaintiff has alleged that the individual Defendants perpetuated a prolonged multi-year campaign of harassment, threats, and abuse that grossly exceeded the bounds of propriety.

We find Plaintiff's allegations distinguishable from the cases relied upon by Defendants in which this Court rejected IIED claims. *See Smith-Price v. Charter Behavioral Health Sys.*, 164 N.C. App. 349, 355, 595 S.E.2d 778, 783 (2004) (affirming summary judgment on IIED claim by supervisor against former employee where "[the

supervisor] confronted [the employee], [and] he [responded by] threaten[ing] to make accusations against her, yelled at her, walked off his assignment and then, when he returned, threw a package of papers at [the supervisor]" and "[t]he next day [the employee] filed a complaint of sexual harassment against [the supervisor]"); *Guthrie v. Conroy*, 152 N.C. App. 15, 24, 567 S.E.2d 403, 410 (2002) (affirming summary judgment in favor of defendant on plaintiff's IIED claim where defendant "(1) held plaintiff from behind, and touched or rubbed her neck and shoulders; (2) 'irritated' her by placing a lampshade on her head when she fell asleep with her head on her desk; (3) threw potting soil and water on plaintiff while she was planting flowers at work, remarking when he threw a cup of water on plaintiff that he'd 'always wanted to see [her] in a wet T shirt'; and (4) placed a Styrofoam 'peanut' and other small objects between the legs of a 'naked man' statuette that plaintiff displayed on her windowsill at work and asked her 'how she liked it' with the addition"); *Johnson v. Bollinger*, 86 N.C. App. 1, 5-6, 356 S.E.2d 378, 381-82 (1987) (IIED claim properly dismissed where defendant approached plaintiff in angry and threatening manner while carrying pistol, shook his hand in plaintiff's face, and said in loud voice, "I will get you"); *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 493-94, 340 S.E.2d 116, 122-23 (affirming summary judgment for defendants as to IIED claims where allegations involved screaming and shouting, name-calling, throwing menus, and

various hostile acts toward pregnant employee), *disc. review denied*, 317 N.C. 334, 346 S.E.2d 140 (1986).

We cannot agree with Defendants that *Smith-Price*, *Guthrie*, *Johnson*, or *Hogan* compel the dismissal of Plaintiff's IIED claims in the present case. In none of these cases was the conduct of the defendants akin to the multi-year systematic pattern of harassment, intimidation, and abuse alleged to have been inflicted upon Plaintiff by the individual Defendants here. While Defendants are correct that isolated incidents of insults, threats, and similar conduct are insufficient to support a claim for IIED under North Carolina law, *see Chidnese v. Chidnese*, 210 N.C. App. 299, 316, 708 S.E.2d 725, 738 (2011), Plaintiff has alleged far more here. Although some of her allegations of insults and indignities would not by themselves rise to the level of extreme and outrageous conduct necessary for an IIED claim, her allegations — when considered in their entirety — assert not merely isolated insults but rather unrelenting abuse that involved her being beaten, physically restrained, threatened, and subjected to extraordinarily vulgar and offensive comments. For these reasons, Plaintiff has satisfied the pleading requirements for this tort. Her allegations describe a prolonged exposure to intolerable conduct that no human being should be forced to endure.[8]

---

[8] In her second amended complaint, Plaintiff alleges that "[she] is now disabled, in pain, suffers from post-traumatic stress disorder and major depression from the attacks and harassment against

Consequently, we hold that the acts of Buccafurri, Murray, Hull, Dinero, Progelhof, and Zanzarella as alleged by Plaintiff are sufficient to form the basis for IIED claims against them.[9]   Therefore, we reverse the trial court's  dismissal of Plaintiff's IIED claims as to these Defendants.

### 3. Assault Claims

Plaintiff also argues that the trial court erred by dismissing her assault claims against Zanzarella, Progelhof, Buccafurri, and Hull and all but one of her assault claims against Murray.[10]   The statute of limitations for an assault claim is three years.  N.C. Gen. Stat. § 1-52(19) (2015).  The most recent incident she alleges in support of these assault claims occurred in 2004.  In the Federal Action, Plaintiff did not assert any assault claims except for the one brought against Murray in relation to the Pier Incident, and, for this reason, her deadline for asserting the remaining assault claims was not tolled.  Consequently, since the present action was not filed until 2013, these assault claims are barred by the statute of limitations and were

---

her, and is unemployable in her field. . . ."  Defendants do not argue that Plaintiff has failed to sufficiently plead the third element of an IIED claim.

[9] It remains to be seen, of course, whether Plaintiff will be able to offer admissible evidence in support of these allegations at the summary judgment stage or at trial.

[10] Multiple assault claims were asserted by Plaintiff against Murray, but the only one left undisturbed by the trial court's 4 February 2015 Order was the assault claim related to the Pier Incident.

correctly dismissed by the trial court. *See Renegar*, 145 N.C. App. at 85, 549 S.E.2d at 232-33.

### 4. Claims for Tortious Interference with Potential Economic Advantage

Plaintiff next contends that the trial court erred in dismissing her two claims for tortious interference with prospective economic advantage ("TIPEA"). Plaintiff asserted these claims based on two separate theories.

Her first claim was brought against all Defendants and was based on their alleged interference with Plaintiff's job opportunity with the UMC. The trial court dismissed this claim as to all Defendants except Buccafurri. Plaintiff's second TIPEA claim was brought only against the Association, Buccafurri, Hull, Progelhof, and Zanzarella and concerned her potential employment with the Boys and Girls Home as a mentor supervisor.

"An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party." *Walker v. Sloan*, 137 N.C. App. 387, 392-93, 529 S.E.2d 236, 241 (2000). In order "to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Id.* at 393, 529 S.E.2d at 242 (citation and quotation marks omitted).

### a. The Association and Dinero

The statute of limitations for TIPEA claims is three years. *See* N.C. Gen. Stat. § 1-52. The allegations in the second amended complaint relevant to these claims concern actions taken sometime prior to 1 July 2005. In the Federal Action, Plaintiff did not assert a TIPEA claim against either the Association or Dinero and, therefore, no tolling of the limitations period occurred as to these claims. *See Renegar*, 145 N.C. App. at 85, 549 S.E.2d at 232-33. Therefore, the trial court correctly dismissed her TIPEA claims against the Association and Dinero as time barred.

### b. Hull, Progelhof, Zanzarella, Murray, and Buccafurri

Plaintiff's TIPEA claims against Hull, Progelhof, Zanzarella, Murray, and Buccafurri were brought in the Federal Action. Therefore, unlike her claims against the Association and Dinero, the statute of limitations was tolled as to her TIPEA claims brought against these Defendants.

We address separately each of Plaintiff's two theories supporting her TIPEA claims against these Defendants.

### i. Potential Employment with the UMC

Plaintiff's TIPEA claims against Hull, Progelhof, Zanzarella, Murray, and Buccafurri[11] related to her potential employment with the UMC alleged, in pertinent part, the following:

> 42.   Defendants Association, Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella knew that [Plaintiff] was a graduate of the Yale Divinity School, that she had achieved official certification as a candidate for ordained ministry in the United Methodist Church, and that she was an active participant in several local Christian ministries.
>
> . . . .
>
> 159. Upon information and belief, the Church officials revoked [Plaintiff's] certification because Defendant Buccafurri collected libelous materials previously written by Hull, Dinero, Progelhof, Zanzarella and Murray *exactly for this purpose* and sent false information about [her] to Church officials.
>
> 160. Upon information and belief, the decision to revoke [Plaintiff's] certification was also based upon the false criminal charges filed against [her] by Defendants Murray, Buccafurri, Hull, Progelhof, and Zanzarella.
>
> . . . .
>
> 162. Defendants Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella had knowledge of the facts and circumstances associated with [Plaintiff's] prospective entry into a contract with the United Methodist Church.
>
> 163. Defendants Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella instituted false criminal charges

---

[11] As noted above, the trial court denied Buccafurri's motion to dismiss the TIPEA claim alleging interference with Plaintiff's potential employment with the UMC. Therefore, we must address the validity of Plaintiff's TIPEA claim regarding her employment opportunity with the UMC only as to Hull, Progelhof, Zanzarella, and Murray.

against [Plaintiff], and deliberately caus[ed her] to suffer emotional distress severe enough to preclude her ordination in the United Methodist Church.

164. Upon information and belief, Defendants Buccafurri, Dinero, Hull, Progelhof, Murray, and Zanzarella compiled documents containing false and misleading statements that besmirched [Plaintiff's] reputation.

165. This package of documents contained false statements that Defendants Buccafurri, Dinero, Hull, Progelhof, Murray and Zanzarella knew to be false.

166. Defendants Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella maliciously induced [the] United Methodist Church not to enter into the prospective contract with [Plainitff].

167. But for the tortious interference of Defendants Association, Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella [Plaintiff] and the United Methodist Church would have entered into a valid contract.

168. Defendants Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella made false statements about [Plaintiff] to the United Methodist Church.

169. Defendants Buccafurri's, Murray's, Dinero's, Hull's, Progelhof's, and Zanzarella's actions were not done in the legitimate exercise of their own rights, but with a malicious design to injure [Plaintiff].

170. Defendants Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella acted without justification.

171. Defendants Buccafurri's, Murray's, Dinero's, Hull's, Progelhof's, and Zanzarella's actions resulted in actual damages to [Plaintiff].

172. On or about February 2, 2005, United Methodist

Church officials revoked [Plaintiff's] ordination candidate certification.

173. An ordination certificate is a prerequisite to becoming an ordained minister in the United Methodist Church.

174. Defendant's [sic] caused [Plaintiff] to lose substantial economic benefits in the form of salary and fringe benefits.

(Emphasis added).

In *Walker*, we elaborated on the pleading requirements applicable to TIPEA claims:

> We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendants' own rights, but with design to injure the plaintiffs, or gaining some advantage at their expense. . . . Maliciously inducing a person not to enter into a contract with another, which he would otherwise have entered into, is actionable if damage results. The word "malicious" used in referring to malicious interference with formation of a contract does not import ill will, but refers to an interference with design of injury to plaintiffs or gaining some advantage at their expense. Thus, to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.

*Walker*, 137 N.C. App. at 393, 529 S.E.2d at 241-42 (internal citations, quotation marks, brackets, and ellipses omitted). *See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C. Inc.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992) (a claim for "tortious

interference with prospective economic advantage may be based on conduct which prevents the making of contracts").

Here, Plaintiff has alleged sufficient facts tending to show that Hull, Progelhof, Zanzarella, and Murray knowingly wrote false and misleading statements about her for the purpose of preventing her from being hired by the UMC and that but for their actions she would have entered into a valid employment contract with the UMC. Moreover, she alleges these actions were taken by Defendants with full knowledge that she was pursuing a position with the UMC and that their intention was to undermine — without justification — her job prospects with the UMC. Finally, she has alleged that as a result of these actions she suffered actual damages in the form of loss of employment opportunity, salary, and fringe benefits.

We believe these allegations satisfy the pleading requirements for a TIPEA claim. It is well settled that

> [a] pleading adequately sets forth a claim for relief if it contains: (1) A short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled. The general standard for civil pleadings in North Carolina is notice pleading. Pleadings should be construed liberally and are sufficient if they give notice of the events and transactions and allow the adverse party to understand the nature of the claim and to prepare for trial.

*Haynie v. Cobb*, 207 N.C. App. 143, 148-49, 698 S.E.2d 194, 198 (2010) (internal citations and quotation marks omitted); *see also Fournier v. Haywood Cty. Hosp.*, 95 N.C. App. 652, 654, 383 S.E.2d 227, 228 (1989) ("Pleadings must be liberally construed to do substantial justice, and must be fatally defective before they may be rejected as insufficient.").

In applying this liberal standard to Plaintiff's allegations, we conclude the trial court erred in dismissing her TIPEA claims against Hull, Progelhof, Zanzarella, and Murray based on her prospective employment with the UMC, and we therefore reverse this portion of the trial court's 4 February 2015 order.

### ii. Potential Employment with Boys and Girls Home

We reach a contrary result with regard to Plaintiff's TIPEA claims relating to her potential employment with the Boys and Girls Home. It is well established that "[w]hile we treat plaintiffs' factual allegations as true, we may ignore plaintiffs' legal conclusions." *Skinner v. Reynolds*, __ N.C. App. __, __, 764 S.E.2d 652, 655 (2014) (citation and quotation marks omitted).

Plaintiff has failed to make specific factual allegations as to acts by Defendants Hull, Progelhof, Zanzarella, and Buccafurri that would give rise to a valid TIPEA claim based on her failure to obtain employment with the Boys and Girls Home. As discussed above, Plaintiff expressly alleged that these Defendants were aware that she had achieved official certification as a candidate for ordained ministry within the

UMC and were responsible for a packet containing false information about her being sent to the UMC that resulted in the UMC's decision to revoke her ordination candidate certification.

No comparable allegations exist with regard to her TIPEA theory relating to the Boys and Girls Home. Instead, Plaintiff essentially argues that the Boys and Girls Home declined to hire her because of the fact that criminal charges had been previously filed against her. While her second amended complaint does contend that these Defendants were responsible for the filing of the false charges, she has failed to adequately allege that the charges were taken out against her for the specific purpose of thwarting her chances of obtaining employment with the Boys and Girls Home.

Moreover, although the section of Plaintiff's second amended complaint addressing this cause of action contains a number of conclusory allegations that track the elements of a TIPEA claim, such conclusions alone are insufficient to state a legally sufficient claim for TIPEA. *See Walker*, 137 N.C. App. at 392, 529 S.E.2d at 241 ("In ruling on a Rule 12(b)(6) motion to dismiss [a TIPEA claim], the trial court regards all factual allegations of the complaint as true. Legal conclusions, however, are not entitled to a presumption of truth." (internal citation omitted)). For these reasons, we affirm the trial court's dismissal of Plaintiff's TIPEA claims against Hull, Progelhof, Zanzarella and Buccafurri arising out of her failure to obtain employment with the Boys and Girls Home.

**5. NIED Claims**

Plaintiff next challenges the trial court's dismissal of her claims for NIED against all Defendants. "In order to state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause plaintiff severe emotional distress, and (3) the conduct did in fact cause plaintiff severe emotional distress." *Fields v. Dery*, 131 N.C. App. 525, 526-27, 509 S.E.2d 790, 791 (1998) (citation, quotation marks, and ellipses omitted), *disc. review denied*, 350 N.C. 308, 534 S.E.2d 590 (1999).

The fatal flaw with Plaintiff's NIED claims is that the allegations in her second amended complaint repeatedly reference a pattern of *intentional* conduct by Defendants. Moreover, the NIED section of her pleadings states, in pertinent part, as follows:

> 210. Defendants Association, Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella were negligent in that they failed to use ordinary care not to inflict emotional distress on [Plaintiff].
>
> 211. Defendants Association, Buccafurri, Murray, Dinero, Hull, Progelhof, and Zanzarella breached this duty by participating in a *systematic pattern of harassment, threats, violence, and intimidation* against [Plaintiff].

(Emphasis added).

These allegations demonstrate the invalidity of Plaintiff's NIED claims. It is nonsensical to assert that one or more of the Defendants were *negligent* by engaging in a purposeful scheme to harass, threaten, and intimidate her. Therefore, Plaintiff's NIED claims fail as a matter of law and were properly dismissed by the trial court. *See Horne v. Cumberland Cty. Hosp. Sys., Inc.*, 228 N.C. App. 142, 149, 746 S.E.2d 13, 19 (2013) (affirming dismissal of NIED claim where "plaintiff's NIED claim is premised on allegations of intentional — rather than negligent — conduct").

### III. Defendants' Cross-Appeal

The only remaining issue for resolution by this Court concerns Defendants' cross-appeal. In their cross-appeal, Defendants contend that the trial court erred in failing to dismiss Plaintiff's complaint in its entirety under Rule 12(b)(7) because Plaintiff failed to join a necessary party — the V. Duncan Radcliffe Trust (the "Trust"). We disagree.

Pursuant to Rule 12(b)(7), a defendant may move to dismiss an action for "[f]ailure to join a necessary party." N.C.R. Civ. P. 12(b)(7). "When faced with a motion under Rule 12(b)(7), the court will decide if the absent party should be joined as a party. If it decides in the affirmative, the court will order him brought into the action." *Fairfield Mountain Prop. Owners Ass'n, Inc. v. Doolittle*, 149 N.C. App. 486, 487, 560 S.E.2d 604, 605 (2002) (citation and quotation marks omitted).

It is well settled that "[a] 'necessary' party is one whose presence is required for a complete determination of the claim, and is one whose interest is such that no decree can be rendered without affecting the party." *Godette v. Godette*, 146 N.C. App. 737, 739, 554 S.E.2d 8, 9 (2001) (citation and quotation marks omitted). Defendants contend that "the V. Duncan Radcliffe Trust [was] the true owner of the residence located at 1421 Avenel Drive, Wilmington, NC 28411 at all relevant times and [Plaintiff], Trustee of the V. Duncan Radcliffe Trust was the acting trustee at all relevant times." They therefore argue that Plaintiff's failure to join the Trust as a party mandates the dismissal of this action under Rule 12(b)(7). This argument is meritless.

This lawsuit involves intentional tort claims asserted by Plaintiff for acts allegedly inflicted upon her that caused her to personally suffer emotional distress, physical injuries, and financial harm. Therefore, because Plaintiff's claims are personal and unique to her, the Trust cannot be characterized as a necessary party. Accordingly, the trial court did not err in denying Defendants' Rule 12(b)(7) motions.

## Conclusion

For the reasons stated above, we reverse the portions of the trial court's 4 February 2015 order dismissing Plaintiff's (1) IIED claims against Buccafurri, Dinero, Hull, Progelhof, Zanzarella, and Murray; and (2) TIPEA claims concerning

her potential employment with the UMC against Murray, Hull, Progelhof and Zanzarella. We affirm the trial court's 21 August 2014 order.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Judges CALABRIA and TYSON concur.