Se. Anesthesiology Consultants, PLLC v. Rose, 2019 NCBC 51.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 9002
MASTER FILE
(related case 18 CVS 2955)

SOUTHEAST ANESTHESIOLOGY
CONSULTANTS, PLLC and
MEDNAX SERVICES, INC.,

             Plaintiffs,

v.

GEORGE S. ROSE, M.D.; W.
EDMOND FITZGERALD, M.D.;
ADAM HODIERNE, M.D.; DAVID C.
JOSLIN, M.D.; J. TERRILL
MASSAGEE, M.D.; KEVIN D.
OSSEY, M.D.; DANIEL SINGER,
M.D.; ROSE ANESTHESIA, PLLC;
ANESTHESIOLOGY
CONSULTANTS OF NORTH
CAROLINA, PLLC; and THE MOSES
H. CONE MEMORIAL HOSPITAL
OPERATING CORPORATION d/b/a
CONE HEALTH,

             Defendants.

**ORDER AND OPINION ON
DEFENDANT CONE HEALTH'S
PARTIAL MOTION TO DISMISS**

PETER CARIGNAN, M.D.;
CHARLENE EDWARDS, M.D.;
ROBERT FITZGERALD, M.D.;
WILLIAM E. FITZGERALD, JR.,
M.D.; MICHAEL A. FOSTER, M.D.;
JOHN R. GERMEROTH, M.D.; JOHN
F. HATCHETT, JR., M.D.; ADAM
HODIERNE, M.D.; KEVIN D.
HOLLIS, M.D.; CARSWELL
JACKSON, M.D.; KYLE E.
JACKSON, M.D.; DAVID C. JOSLIN,
M.D.; JAMES T. MASSAGEE, M.D.;
CHRISTOPHER P. MOSER, M.D.;

[Type here]

KEVIN D. OSSEY, M.D.; GEORGE ROSE, M.D.; JAMES D. SINGER, M.D.; STEPHEN E. TURK, M.D.; and ANESTHESIOLOGY CONSULTANTS OF NORTH CAROLINA, PLLC,

           Plaintiffs,

v.

SOUTHEAST ANESTHESIOLOGY CONSULTANTS, PLLC; AMERICAN ANESTHESIOLOGY, INC.; MEDNAX, INC.; MEDNAX SERVICES, INC.; and ERIC W. MASON, M.D.,

           Defendants.

1.     **THIS MATTER** is before the Court on Defendant The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health's ("Cone Health") Partial Motion to Dismiss (the "Motion") pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). (EFC No. 19.) For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** the Motion.

> *Nelson Mullins Riley & Scarborough LLP, by Noah H. Huffstetler, III, Mark A. Stafford, and Candace Friel, for Plaintiffs Southeastern Anesthesiology Consultants, PLLC and MEDNAX Services, Inc.*

> *Fox Rothschild LLP, by Maureen Demarest Murray, Patrick M. Kane, and Ellis William Martin, for Defendant The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health.*

Robinson, Judge.

## I.     FACTUAL BACKGROUND

2.     The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6), but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.   This statement of facts assumes all well-pleaded factual allegations to be true solely for purposes of the Motion.  *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018)

### A.     <u>The Parties</u>

3.     Plaintiff Southeastern Anesthesiology Consultants, PLLC ("SAC") is a professional limited liability company organized and existing under the laws of the State of North Carolina.  (First Am. Compl. ¶ 1, ECF No. 3 ["FAC"].)  SAC is wholly owned by a licensed anesthesiologist, Eric W. Mason, M.D. ("Dr. Mason"), and provided professional anesthesiology services in Guilford County, North Carolina prior to the initiation of this litigation.  (FAC ¶ 14.)

4.     Plaintiff MEDNAX Services, Inc. ("MEDNAX") is a corporation organized and existing under the laws of the state of Florida.  (FAC ¶ 2.)  MEDNAX provides medical practice management and administrative services for SAC pursuant to an agreement between the entities (the "Management Services Agreement").  (FAC ¶ 19.)  SAC and MEDNAX are referred to collectively herein as "Plaintiffs."

5.     Defendants George S. Rose, M.D. ("Dr. Rose"), W. Edmond Fitzgerald, M.D., Adam Hodierne, M.D., J. Terrill Massagee, M.D., Kevin D. Ossey, M.D. ("Dr. Ossey"), and Daniel Singer, M.D., are citizens and residents of Guilford County, North Carolina, (FAC ¶¶ 4–6, 8–10), and Defendant David C. Joslin, M.D. ("Dr. Joslin")

(collectively, "the Individual Defendants") is a citizen and resident of Iredell County, North Carolina, (FAC ¶ 7).

6.  Defendant Rose Anesthesia, PLLC ("Rose Anesthesia") is a professional limited liability company organized by Dr. Rose in or around October 2, 2017 and existing under the laws of the State of North Carolina. (FAC ¶ 11.) The Individual Defendants have acted and served as "members, employees, representatives[,] or agents" of Rose Anesthesia since its founding. (FAC ¶ 11.)

7.  Defendant Anesthesiology Consultants of North Carolina, PLLC ("ACNC") is a professional limited liability company organized by Dr. Ossey on or around October 18, 2017, and existing under the laws of the State of North Carolina. (FAC ¶ 12.) As with Rose Anesthesia, (*see* FAC ¶ 11), the Individual Defendants are alleged to have acted and served as "members, employees, representatives[,] or agents" of ACNC since its founding, (FAC ¶ 12). Rose Anesthesia and ACNC are referred to collectively herein as the "PLLC Defendants."

8.  Cone Health is a non-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business in Guilford County, North Carolina. (FAC ¶ 13.) Cone Health operates The Moses H. Cone Memorial Hospital ("Cone Memorial Hospital"). (FAC ¶ 16.) As alleged, Cone Memorial Hospital "is the largest and most comprehensive medical center within the local five-county region[,]" with over 500 beds and perform[s] approximately 25,000 surgeries annually, the substantial majority of which require the services of SAC's anesthesiologists (the "SAC Physicians"). (FAC ¶ 16.) The Individual Defendants,

the PLLC Defendants, and Cone Health are referred to collectively herein as "Defendants."

## B. The Agreements

9. Pursuant to the Management Services Agreement, MEDNAX provides various administrative, recruiting and credentialing, and contract negotiation services to SAC in exchange for SAC's payment to MEDNAX of an annual fee. (FAC ¶¶ 20–21.) Plaintiffs allege that Defendants knew of the existence of the Management Services Agreement at all times relevant to this action. (FAC ¶ 19.)

10. On or around November 1, 2010, SAC purchased 100% of the stock and personal goodwill of each shareholder in Greensboro Anesthesia Physicians, P.C. ("GAP") and other assets in which many of the Individual Defendants were shareholders pursuant to a Stock and Personal Goodwill Purchase Agreement (the "Purchase Agreement"). (FAC ¶¶ 23–24.) As part of the purchase, SAC paid "tens of millions of dollars" to several of the Individual Defendants who were owners of GAP. (FAC ¶ 23.)

11. Following the purchase, the SAC Physicians, including the Individual Defendants, were employees of SAC until October 31, 2017 (the "Departure Date"). (FAC ¶ 22.) As employees of SAC, the Individual Defendants each received in excess of $400,000 annually as compensation for their services. (FAC ¶ 28.) As part of their employment with SAC, the Individual Defendants and other SAC Physicians each executed written agreements with SAC, or its predecessor in interest, GAP, certain

of which were amended from time to time (the "Employment Agreement(s)"). (FAC ¶ 27.)

12. The Employment Agreements contain restrictive covenants that prohibit the SAC Physicians, including the Individual Defendants from providing professional anesthesiology services, either directly or through entities such as the PLLC Defendants, in competition with SAC within a specific geographic region and for a "reasonable period of time" following the termination of their employment with SAC (the "Non-Competition Covenants"). (FAC ¶ 41.) Additionally, Plaintiffs allege that the Employment Agreements prohibit the SAC Physicians, directly or through entities such as the PLLC Defendants, from either soliciting SAC's patients or inducing its employees to terminate their relationships with SAC (the "Non-Solicitation Covenants"). (FAC ¶ 41.) At all times relevant to this action, Cone Health knew of the Employment Agreements. (FAC ¶ 27; *see* FAC ¶ 67.)

13. Under the Purchase Agreement, GAP assigned to SAC an agreement, effective November 1, 2010, under which the SAC Physicians served as the exclusive providers of anesthesia services to Cone Health facilities (as assigned and amended from time to time, the "Cone Health Agreement). (FAC ¶¶ 16, 25–26.) According to Plaintiffs, "[b]ut for th[e] assignment" by GAP to SAC of the Cone Health Agreement, SAC would not have executed the Purchase Agreement, and MEDNAX would not have loaned SAC the funds necessary to make the purchase. (FAC ¶ 25.)

14. Plaintiffs allege that the anesthesia services provided by the SAC Physicians under the Cone Health Agreement "are essential to both emergency and

scheduled surgical procedures." (FAC ¶ 26.) Under the Cone Health Agreement, "SAC remained the exclusive provider of anesthesia services for Cone Health" until Cone Health "wrongfully and intentionally terminated" the agreement on November 1, 2017. (FAC ¶¶ 25, 55.) Plaintiffs allege that, at all times relevant to this action, the SAC Physicians knew of the Cone Health Agreement. (FAC ¶ 18.)

C. **Defendants' Alleged Conspiracy and Breaches of the Agreements**

15. In or around early 2017, SAC began negotiations with the Individual Defendants and other SAC Physicians for possible increased compensation packages. (FAC ¶ 29.) SAC offered the SAC Physicians "competitive . . . [and] greater compensation [packages] than existed in the then-current [E]mployment [A]greements," which increased compensation packages would become effective on November 1, 2017. (FAC ¶ 29.) However, at around this same time, the Individual Defendants allegedly began "to act in concert, conspire[,] and collude with one another . . . in order to form competing practices in the form of one or more of the" Defendant PLLCs in an effort to "remove SAC from the relevant marketplace and to exact for themselves additional profits from payors and the consuming public." (FAC ¶ 30.)

16. Then, in or around June 2017, the Individual Defendants, through their common counsel, threatened to file complaints against Plaintiffs with the North Carolina Medical Board ("NCMB") alleging purportedly illegal contractual arrangements between SAC and MEDNAX and "ownership and operational structure of SAC" in violation of NCMB rules and regulations. (FAC ¶ 31.) Plaintiffs contend

the Individual Defendants' threats served as a "pretext for implementing their conspiracy and wrongful conduct and to improperly pressure SAC to accede to [the Individual Defendants'] financial and contractual demands[.]" (FAC ¶ 31.) On or around June 26, 2017, the Individual Defendants, through their counsel, sent SAC a "'Notice of Breach of Employment Agreements and Intent to Terminate' the Employment Agreements of the Individual Defendants and certain of the other SAC Physicians," unless SAC cured its alleged breaches of the Employment Agreements within thirty days. (FAC ¶ 32.) On June 29, 2017, the Individual Defendants filed their complaint with the NCMB as threatened. (FAC ¶ 33.)

17. Plaintiffs further allege that the Individual Defendants' counsel, on their behalf, transmitted documents asserting that SAC breached its obligations under the Employment Agreements, and that SAC and MEDNAX's purported illegal relationship and operations provided the Individual Defendants with the right to terminate their Employment Agreements "for cause" and "relieved [them] of their obligations" under the Non-Competition Covenants and Non-Solicitation Covenants. (FAC ¶¶ 34, 42.) Plaintiffs contend the Individual Defendants had no basis for their allegations, (see FAC ¶ 35), and the NCMB "declin[ed] to take any action in response to the complaint[,]" (FAC ¶ 43).

18. On or around July 19, 2017, the Individual Defendants' counsel sent SAC another notice that the Individual Defendants and "certain other of the SAC Physicians" intended not to renew their Employment Agreements upon their expiration on October 31, 2017 or other dates as provided in the specific Employment

Agreements. (FAC ¶ 36.) Moreover, Plaintiffs allege that, in the months leading up to the filing of this action, the Individual Defendants themselves, and acting as members of the PLLC Defendants after their formation in October 2017, "intentionally, with actual malice, and without justification or recognized privilege," published to Cone Health their allegations against Plaintiffs contained in the notices sent to SAC and the complaint filed with the NCMB in June 2017. (FAC ¶ 37.) Plaintiffs allege this publication of "disparage[ing] and defam[atory] statements" was designed to "cause Cone Health to cease or terminate" the Cone Health Agreement as part of the Individual Defendant's "conspiracy to exact exorbitant sums from SAC." (FAC ¶ 37.)

19.    Plaintiffs additionally allege that, despite the NCMB's refusal to consider the Individual Defendants' complaint based on the same allegations, the Individual Defendants nevertheless conspired to publish these same false, disparaging, and defamatory statements to solicit certain other SAC Physicians and "encourage[] them to breach and/or terminate their [Employment Agreements] and/or prevent SAC from entering into new prospective contractual relations with" the SAC Physicians. (FAC ¶¶ 38, 44.) Cone Health also allegedly asserted to "persons outside their employ such as the Individual Defendants and their counsel, that SAC was unable to fulfill its obligations under the Cone Health Agreement to provide sufficient coverage for anesthesia services." (FAC ¶ 70.) Further, Plaintiffs allege that a member of Cone Health's Medical Staff Office "leaked and published inaccurate and otherwise defamatory information concerning Plaintiffs to a physician" in an attempt to

discourage the physician from working with SAC, calling the physician a "scab" if he were to do so. (FAC ¶ 70.)

20. Plaintiffs aver that SAC has been damaged and "was not permitted" to fulfill its obligations to Cone Health as of November 1, 2017 because of the Individual Defendants' conduct, both personally by them and through the PLLC Defendants, "with Cone Health's complicity and collusion[.]" (FAC ¶ 45.)

21. Faced with the prospect that the SAC Physicians would leave SAC's employ at the end of their respective Employment Agreement periods, Plaintiffs devised a new staffing proposal that, if acceptable to Cone Health, would allow SAC to continue providing exclusive anesthesia services to Cone Health under the Cone Health Agreement. (FAC ¶ 48.) Accordingly, Plaintiffs: (i) sought out and persuaded physicians from other areas of North Carolina, including "hospital-credentialed physicians employed by SAC" or its affiliates, to "become credentialed . . . at Cone Health on a temporary basis[;]" and (ii) advertised nationwide for permanent positions for well-qualified anesthesiologists. (FAC ¶ 48.) Plaintiffs contend their efforts in this regard were "more than sufficient" to meet Cone Health's and its patients' needs and complied "with the credentialing provisions of Cone Health's Medical Staff Bylaws, Rules[,] and Regulations" (the "Bylaws"). (FAC ¶ 48.)

22. Furthermore, Plaintiffs allege that Cone Health was aware of Plaintiffs' efforts in this regard by August 2017. (FAC ¶ 49.) Plaintiffs' proposed staffing plan was "consistent with prior instructions over [SAC's] course of dealing with Cone Health[,]" when providing Cone Health with information necessary to credential

anesthesiologists on a *locum tenens* basis.[1]  (*See* FAC ¶ 49.)  For nearly two months, Cone Health lodged no objection to SAC's efforts, leading SAC to "reasonably assume that the use of locum tenens" anesthesiologists—a practice expressly allowed for under the Bylaws—was acceptable to Cone Health.  (FAC ¶ 50.)

23.    Then, on October 24, 2017, Cone Health's President, Terrance Akin ("Akin"), "definitively stated Cone Health would refuse *any and all locum tenens* credentialing requests submitted by SAC"—a decision allegedly based solely on the personal preferences of certain Cone Health surgeons, and one not permitted by the Cone Health Agreement, the Bylaws, or applicable law (FAC ¶ 51 (emphasis in original).)  Nevertheless, Akin advised that Cone Health would consider a staffing plan so long as it included North Carolina-licensed anesthesiologists practicing at entities affiliated with SAC.  (FAC ¶ 51.)  Based on Akin's representation, "Plaintiffs worked diligently and provided Cone Health with a staffing plan comprised of more than [thirty] North Carolina-licensed and based anesthesiologists, all credentialed at reputable hospitals[,]" several of whom had previously been credentialed at Cone Health-affiliated entities.  (FAC ¶ 52.)

24.    On October 26, 2017, Akin spoke with the President of MEDNAX National Medical Group, David Clark ("Clark"), and represented that Cone Health would consider "non-locums" anesthesiologists from around North Carolina if SAC presented such a plan within twenty-four hours.  (FAC ¶ 53.)  Clark left a voicemail

---

[1] "*Locum tenens*" is a Latin phrase meaning "holding the place" and often used to refer to a "deputy; [] substitute; [or] representative." *Locum Tenens*, Black's Law Dictionary (10th ed. 2014).

for Akin around 6:00 p.m. that evening describing SAC's proposed staffing plan and representing that the details of the plan would be submitted in writing by the morning. (FAC ¶ 54.) Within thirty minutes of Clark's leaving the voicemail, Akin e-mailed a letter dated October 26, 2017 giving SAC notice of Cone Health's intention to terminate the Cone Health Agreement effective November 1, 2017, at least in part on the basis that SAC had breached and "repudiated" the Cone Health Agreement. (FAC ¶ 55.) Akin's e-mailed letter contained no response to SAC's proposed plan described generally in Clark's voicemail. (FAC ¶ 55.) The First Amended Complaint does not allege that Akin had received or listened to Clark's voicemail in advance of sending the October 26 letter.

25.     Early on October 27, 2017, Akin texted Clark stating that he would consider SAC's proposed staffing plan, which SAC then submitted to Cone Health in writing, as promised. (FAC ¶ 56.) Within hours, however, Akin again sent a letter to SAC refusing to consider SAC's proposed plan, "reiterating the termination of the Cone Health Agreement[,]" and referring further discussion of the matter of Cone Health's outside counsel. (FAC ¶ 56.)

26.     Just before noon on October 31, 2017, Cone Health's counsel e-mailed a letter to SAC's counsel representing that Cone Health "remain[ed] willing to discuss this matter and to work with you toward resolving these issues." (FAC ¶ 57.) The letter invited Plaintiffs' representatives to meet with Cone Health's representatives the same day. (FAC ¶ 57.) Plaintiffs' counsel advised Cone Health that SAC representatives could travel to Greensboro for a meeting that day between 5:00 p.m.

and 6:00 p.m. (FAC ¶ 58.) Though Cone Health "initially signaled it would consider such a meeting[,]" it ultimately rejected Plaintiffs' offer to meet. (FAC ¶ 58.) When Plaintiffs' representatives and counsel offered to move the meeting to 4:30 p.m., Cone Health again rejected the offer. (FAC ¶ 58.) Undeterred, at 2:38 p.m, Plaintiffs' counsel notified Cone Health that Dr. Mason and Plaintiffs' counsel "could meet with Cone Health as soon as they could drive to Cone Health's outside counsel's office." (FAC ¶ 59.) Finally, Cone Health agreed to a meeting, which began at 4:30 p.m. (FAC ¶ 59.)

27. Just over an hour before the meeting was to begin, Cone Health's outside counsel e-mailed SAC at 3:21 p.m. advising that "Cone Health has finalized arrangements with another anesthesia group to provide service to Cone Health beginning on November 1[, 2017]." (FAC ¶ 60.) Cone Health's representatives confirmed that this "anesthesia group" was one of the PLLC Defendants, (FAC ¶ 60), though the First Amended Complaint does not specify which of the two PLLC Defendants Cone Health was referring to or whether Cone Health identified the PLLC Defendant with which it had contracted. Cone Health further represented to SAC that, in light of its new exclusive agreement with (one of) the PLLC Defendants, "no SAC anesthesiologist could work for Cone Health as of midnight October 31, 2017." (FAC ¶ 60.) Despite Cone Health's vacillations, SAC continued its efforts to provide an alternative staffing proposal and "had more than fifty [ ] qualified anesthesiologists standing ready, willing[,] and able to provide services for Cone

Health on November 1, 2017 and thereafter." (FAC ¶ 60.) SAC was also continuing its negotiations with the SAC Physicians during this period. (*See* FAC 29.)

28.    According to Plaintiffs, Akin and Cone Health "never intended to consider in good faith" SAC's proposed staffing plan or to allow Cone Health's credentialing personnel to consider the plan pursuant to the Bylaws during the course of their negotiations, though Cone Health had the time and ability to do so. (FAC ¶¶ 61, 62.) Moreover, the Cone Health Agreement provided that, "upon its termination, the hospital privilege of all physician employees of SAC [would] automatically terminate[;]" yet, Cone Health and Akin "somehow deemed all the physicians now associated with one of the PLLC[ Defendants] to be privileged by Cone Health as of the next day, November 1, 2017." (FAC ¶ 62.)

29.    Plaintiffs contend the explanation for Cone Health's actions is clear: "Upon information and belief," Cone Health had "joined the conspiracy" with the Individual Defendants and the Defendant PLLCs after "decid[ing] to breach [the Cone Health Agreement] as a result of the wrongful actions of the [other Defendants]" and "at some time prior" to October 23, 2017. (FAC ¶¶ 61, 63.) According to Plaintiffs, at the time it was negotiating with SAC, Cone Health had "already—and secretly—reached an agreement in principle with the other Defendants or one or more of them[] to use them on an exclusive basis," in order to "exclude Plaintiffs from the Greensboro market[.]" (FAC ¶¶ 63, 80.)

30.    Following the termination of the Cone Health Agreement and Employment Agreements on October 31, 2017, the Individual Defendants and PLLC Defendants,

[Type here]

"with the active assistance and collusion of Cone Health[,]" continued to solicit other SAC Physicians who had not already given SAC notice of their intent to leave its employ, including Dr. Jennifer Allan ("Dr. Allan") and Dr. Richard S. Guidetti ("Dr. Guidetti"). Thereafter, in November 2017, "Cone Health permitted Drs. Allan and Guidetti to work at Cone Health facilities[.]" (FAC ¶ 67.) After SAC informed Cone Health that Cone Health had breached the Cone Health Agreement, Cone Health "demanded" that Dr. Allan and Dr. Guidetti "obtain from SAC a waiver of their" respective Non-Competition Covenants "in order to continue to work at" Cone Health's facilities. (FAC ¶ 67.) According to Plaintiffs, this conduct indicates that Cone Health recognized "and tacitly admit[ed]" that its interference with the Non-Competition covenants in the Employment Agreements with the SAC Physicians was wrongful. (FAC ¶ 67.)

## II. PROCEDURAL BACKGROUND

31. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

32. Plaintiffs initiated this action (Case No. 17 CVS 9002) by filing their Complaint on November 9, 2017, which did not name Cone Health as a party. (*See* Compl., ECF No. 12.)

33. On December 13, 2017, Plaintiffs filed their First Amended Complaint as of right, adding several new allegations and adding Cone Health as a defendant. (*See generally* FAC.) The First Amended Complaint asserts claims against Cone Health for: defamation; civil conspiracy; breach of contract; breach of implied covenant of

good faith and fair dealing; tortious interference with contract, prospective business relations, and economic advantage; breach of duty of loyalty; common law unfair competition; and unjust enrichment. (FAC ¶¶ 68–116.)

34. Cone Health filed the Motion on February 12, 2018. The Motion has been fully briefed, and the Court held a hearing on the Motion on September 26, 2018 at which all parties were represented by counsel.

35. The Motion is ripe for resolution.

### III.   LEGAL STANDARD

36. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the First Amended Complaint in the light most favorable to Plaintiffs. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.* 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCBC Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the First Amended Complaint as true. *See Krawiec*, 370 N.C. at 606, 811 S.E.2d at 546. The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

37. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no

law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615, 821 S.E.2d at 737 n.7 (citations omitted).

## IV. ANALYSIS

38. The Motion seeks dismissal of Plaintiffs' claims against Cone Health for: (i) breach of implied covenant of good faith and fair dealing; (ii) tortious interference with contract, prospective business relationships, and prospective economic advantage; and (iii) civil conspiracy.[2]

### A. Breach of Implied Covenant of Good Faith and Fair Dealing

39. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing alleges that Cone Health breached the covenant by its "misleading actions and statements with regard to SAC's proposed staffing plans during August through October 2017, . . . and its secret and wrongful collusion and conspiracy with the other Defendants to oust SAC from the local market place, . . . with the specific intent to defeat the purpose of the Cone Health Agreement[.]" (FAC ¶ 91.) Plaintiffs also

---

[2] The Motion also seeks dismissal of Plaintiffs' claim for defamation. Plaintiffs voluntarily dismissed their defamation claim without prejudice on September 26, 2018, (ECF No. 85), thus mooting Cone Health's request for dismissal of that claim. As a result, the Court does not address that claim here.

assert a claim against Cone Health for breach of the Cone Health Agreement. (*See* FAC ¶¶ 85–86.) Cone Health does not seek dismissal of the breach of contract claim; rather, the Motion targets only Plaintiffs' good faith and fair dealing claim.

40. "Under North Carolina law, every contract contains 'an implied covenant of good faith and fair dealing that neither party will do anything which injures the rights of the other to receive the benefits of the agreement.'" *Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018) (quoting *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)). "A breach of the implied covenant of good faith and fair dealing 'requires the wrongful intent of a party to deprive another party of its contractual rights.'" *Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at \*30 (N.C. Super. Ct. Apr. 20, 2018) (quoting *RREF BB Acq. v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61 at \*47 (N.C. Super. Ct. June 9, 2015)).

41. Cone Health seeks dismissal of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing on two grounds. First, Cone Health contends that the factual allegations supporting Plaintiffs' good faith and fair dealing claim are "the same facts" supporting Plaintiffs breach of contract claim. (Br. Supp. Cone Health's Partial Mot. to Dismiss 17, ECF No. 20 ["Br. Supp."].) Cone Health argues that the Court should therefore dismiss Plaintiffs' independent good faith and fair dealing claim as duplicative or "part and parcel" of Plaintiffs' breach of contract claim. (Br. Supp. 16–18.) Cone Health supports its first argument with two unpublished North Carolina federal district court opinions, *BioSignia, Inc. v. Life Line Screening*

*of Am., Ltd.*, 2014 U.S. Dist. LEXIS 89678 (M.D.N.C. June 30, 2014), and *Rezapour v. Earthlog Equity Grp., Inc.*, 2013 U.S. Dist. LEXIS 92124 (W.D.N.C. July 1, 2013).

42. Generally, "where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract," North Carolina courts "treat the former claim as 'part and parcel' of the latter." *Cordaro*, 817 S.E.2d at 256 (quoting *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996)). The North Carolina federal court decisions relied on by Cone Health interpret this "part and parcel" language to suggest that "the weight of North Carolina authority holds that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately." *BioSignia*, 2014 U.S. Dist. LEXIS 89678, at *13 (dismissing such good faith and fair dealing claim while allowing breach of contract claim to proceed and noting plaintiffs could "assert theories of breach of good faith in support of its claims for breach of contract"); *Rezapour*, 2013 U.S. Dist. LEXIS 92124, at *11–12 ("Since[] [p]laintiffs' allegations of breach of the duty of good faith and fair dealing center on alleged breaches of express contract terms, these claims rise and fall with the underlying claims for breach of contract. Therefore, [p]laintiffs' allegations are duplicative of [p]laintiffs' allegations of breach of contract elsewhere in the complaint and will be dismissed as a freestanding claim for relief.").

43. North Carolina state court decisions considering good faith and fair dealing claims that are "part and parcel" of breach of contract claims, however, have concluded that the two claims merely stand or fall together, not that the independent

good faith and fair dealing claim should necessarily be dismissed as duplicative. *See Cordaro*, 817 S.E.2d at 256 (affirming dismissal of good faith and fair dealing claim that shared identical basis for breach of contract claim for which dismissal was also affirmed); *Haigh v. Superior Ins. Mgmt. Grp.*, 2017 NCBC LEXIS 100, at *12–17 (N.C. Super. Ct. Oct. 24, 2017) (denying motion to dismiss under Rule 12(b)(6) good faith and fair dealing claim that was "the same as the claim for" breach of contract where motion to dismiss breach of contract claim was denied). The Court therefore concludes that Cone Health's argument for dismissal of Plaintiffs' good faith and fair dealing claim on this basis is unavailing.

44.    Cone Health's second argument is that Plaintiffs' good faith and fair dealing claim amounts to a claim for bad faith breach of contract, which North Carolina law does not recognize in this context. (Reply Br. Further Supp. of Cone Health's Partial Mot. to Dismiss 9–10, ECF No. 58 ["Reply"].) In response to Cone Health's contention that the good faith and fair dealing claim are premised on allegations identical to those support the breach of contract claim, Plaintiffs identify several distinct allegations in support of their good faith and fair dealing claim. (*See* Pls.' Br. Resp. to Def.'s Partial Mot. to Dismiss 22, ECF No. 38 ["Br. Resp."].) These allegations include that Cone Health: (i) knew Plaintiffs intended to include *locum tenens* in SAC's proposed staffing plan but lodged no objection to the plan for two months while Plaintiffs prepared to implement the plan, (FAC ¶¶ 49–53); (ii) later refused to consider any proposed plan that included *locum tenens* physicians even though this option was allowed for under the Cone Health Agreement, (FAC ¶¶ 51, 54–56); and

(iii) refused to consider Plaintiffs' attempts to resolve its objections and secretly contracted with the Individual Defendants, all while purporting to negotiate with Plaintiffs, (FAC ¶¶ 51–64).  Plaintiffs then allege these "misleading actions and statements regarding SAC's proposed staffing plans . . . well all undertaken in bad faith[] and with the specific intent to defeat the purpose of the Cone Health Agreement[.]"  (FAC ¶ 91.)

45.     Cone Health contends that these allegations "indicate[] that [Plaintiffs'] breach of the implied duty of good faith and fair dealing claim is actually an attempted bad faith breach of contract claim[,]" which North Carolina only recognizes where the parties to the contract bear certain "special relationships" not alleged to exist here—e.g., insurance contracts and contracts for funeral services.  (Reply  9–10 (citing *Abbington SPE, LLC v. U.S. Bank, N.A.*, 352 F. Supp. 3d 508, 512 (E.D.N.C. 2016), *aff'd*, 698 Fed. App'x 750 (4th Cir. 2017); *Ada Liss Grp. v. Sara Lee Corp.*, 2009 U.S. Dist. LEXIS 91792, at *42 n. 10 (M.D.N.C. Sept. 30, 2009)).)

46.     The Court does not read the First Amended Complaint as attempting to assert a bad faith breach of contract claim.  Though Plaintiffs use the phrase "bad faith" to characterize Cone Health's conduct between August and October 2017, this does not mandate a conclusion that Plaintiffs' have failed to assert a breach of the covenant of good faith and fair dealing claim.  *See, e.g.*, *Haigh*, 2017 NCBC LEXIS 100, at *13, 17 (denying motion to dismiss good faith and fair dealing claim where the complaint alleged the defendant "acted in bad faith with respect to the [contracts] by

negotiating and receiving its own direct commission[s] from" third parties (second alteration in original)).

47. The Court concludes that Plaintiffs have set forth allegations sufficient to state a claim for breach of the implied covenant of good faith and fair dealing. The Motion therefore should be, and is, DENIED as to that claim.

## B. Tortious Interference with Contract, Prospective Business Relationships, and Prospective Economic Advantage

48. Plaintiffs' plead their tortious interference claim as a single claim against all Defendants for "Tortious Interference with Contract, Prospective Business Relationships, and Prospective Economic Advantage." As to Cone Health,[3] the Court construes the First Amended Complaint as alleging that Cone Health tortiously interfered: (i) with SAC's contractual obligations to MEDNAX under the Management Services Agreement; (ii) with certain of the SAC Physicians', including Dr. Allan's and Dr. Guidetti's, contractual obligations to SAC under their respective Employment Agreements; and (iii) with SAC's prospective business relations with the anesthesiologists it proposed to submit for credentialing at Cone Health as part of SAC's proposed staffing plan in late October 2017 (the "Replacement Anesthesiologists"). *See Artistic S. Inc. v. Lund*, 2015 NCBC LEXIS 113, at \*26 (N.C.

---

[3] In its brief in support of the Motion, Cone Health questions whether Plaintiffs intend to assert against it a claim for tortious interference. (Br. Supp. 10.) Cone Health observes that Plaintiffs' tortious interference claim in the First Amended Complaint is "virtually identical" to the one pleaded in Plaintiffs original Complaint in which Cone Health was not named as a defendant. (Br. Supp. 10.) Plaintiffs' response to the Motion, however, makes clear that Plaintiffs intend to assert a tortious interference claim against Cone Health. (*See* Br. Resp. 8.) The Court therefore considers whether Plaintiffs have adequately alleged this claim against Cone Health.

Super. Ct. Dec. 9, 2015) (construing similarly pleaded and styled tortious interference claim in this manner).

49.     To state a claim for tortious interference with contract, a complaint must allege that:

> (1) a valid contract [exists] between the plaintiff and a third-person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts with justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). As this Court has often noted, "[t]he pleading standards for a tortious interference with contract claim are strict." *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct. Mar. 27, 2017) (alteration in original) (quoting *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12 at *15 (N.C. Super. Ct. Feb. 8, 2017)); *see also Charah, LLC v. Sequoia Servs. LLC*, 2019 NCBC LEXIS 18, at *13 (N.C. Super. Ct. Mar. 11, 2019); *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *47 (N.C. Super. Ct. May 8, 2018).

### 1.     The Management Services Agreement

50.     Plaintiffs allege that Cone Health tortiously interfered with the Management Services Agreement by "destroying the economic value of SAC's Greensboro-based practice," presumably in part by breaching the Cone Health Agreement, which "caused SAC to be unable to fulfill its obligations to MEDNAX" under the Management Services Agreement. (FAC ¶ 103.) As alleged, it appears that only MEDNAX can assert a claim for tortious interference with the Management

Services Agreement though the claim is brought by all Plaintiffs—i.e., SAC is the third-party who Cone Health (and the other Defendants) allegedly induced to breach the Management Services Agreement with MEDNAX. (*See* Reply 6 n.2.)

51. Cone Health argues that the allegation that Cone Health's breach of the Cone Health Agreement caused SAC to breach the Management Services Agreement is insufficient as a matter of law to support the inducement element of Plaintiffs' tortious interference claim. (Br. Supp. 12–13; Reply 6.) The Court agrees.

52. This Court has interpreted "induce" to mean "purposeful conduct," "active persuasion, request, or petition." *KRG New Hill Place, LLC v. Springs Inv'rs, LLC*, 2015 NCBC LEXIS 20, at *14–15 (N.C. Super. Ct. Feb. 27, 2018) (quoting *Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354, 712 S.E.2d 366, 369–70 (2011)); *see also Charah*, 2019 NCBC LEXIS 18, at *18. Purposeful conduct, active persuasion, request, and petition require that a defendant do more than cause a third party to breach an agreement with the plaintiff. *See KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16; *see also Patel v. Scotland Mem'l Hosp.*, 1995 U.S. Dist. LEXIS 5258, at *21–23 (M.D.N.C. Mar. 31, 1995) (stating that, under North Carolina law, "[a] claim of breach by [d]efendants of a contract with [the plaintiff-anesthesiologist] which in turn causes [plaintiff] to breach contracts with third parties . . . does not support a claim for tortious interference with contract without some allegation that [d]efendants affirmatively induced the third parties to breach their contracts with [plaintiff]").

53.     Accordingly, here, Plaintiffs' allegation that Cone Health's breach of the Cone Health Agreement caused SAC to breach the Management Services Agreement, without more, is insufficient to plead that Cone Health induced SAC's breach of the Management Services Agreement. *KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16–17; *see Patel*, 1995 U.S. Dist. LEXIS 5258, at *22–23.

54.     Plaintiffs' seek to avoid this conclusion by attempting to distinguish *KRG New Hill Place* and *Patel* on factual and legal grounds. (Br. Resp. 12–13.) First, Plaintiffs argue that this Court's analysis in *KRG New Hill Place* "was limited to [ ] tortious interference with a prospective contract—not with an existing agreement such as the Management Services Agreement." (Br. Resp. 12.) This Court has, however, specifically applied *KRG New Hill Place*'s concept of inducement to a claim for tortious interference with an existing contract. *See Charah*, 2019 NCBC LEXIS 18 at *18–19 ("Although this Court previously considered the interpretation of 'induce' in the context of a claim for tortious interference with prospective economic advantage, 'there is nothing about the [C]ourt's analysis of that word's meaning [in that type of claim] that makes it inapplicable to this case." (alterations in original) (quoting *KRG New Hill Place*, 2015 NCBC LEXIS 20, at *15–16)). The Court discerns no reason to depart from this analysis here.

55.     Plaintiffs also attempt to distinguish *Patel*, arguing that there the plaintiff "did not allege that the defendants 'affirmatively induced' the third parties' breach of contract[,]" while, here, Plaintiffs have alleged "with specificity the actions of Cone Health and the consequences of those actions." (Br. Resp. 13.) However, beyond mere

conclusory allegations that Cone Health induced SAC's breach of the Management Services Agreement, the paragraphs of the First Amended Complaint cited to by Plaintiffs in opposing the Motion allege only that Cone Health knew of the Management Services Agreement and lacked justification in inducing its breach. (Br. Resp. 11 (citing FAC ¶¶ 19 (existence of valid contract; knowledge), 96–97 (same), 102–03 (lack of justification; damages)).) In sum, Plaintiffs' allegations regarding Cone Health's tortious interference with the Management Services Agreement "do not equate to the sort of purposeful conduct or active persuasion necessary for inducement." *Charah*, 2019 NCBC LEXIS 18, at *18–19 (internal quotation marks omitted).

56. Plaintiffs have therefore failed to sufficiently allege that Cone Health induced SAC to breach the Management Services Agreement with MEDNAX. *See id.*; *KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16–17; *see also Patel*, 1995 U.S. Dist. LEXIS 5258, at *22–23. Accordingly, the Court concludes that the Motion should be, and is, GRANTED to the extent it seeks dismissal of Plaintiffs' claim for tortious interference with the Management Services Agreement.

## 2. The Employment Agreements

57. As to Cone Health, Plaintiffs' claim for tortious interference with the Employment Agreements alleges that: (i) SAC was a party to the Employment Agreements with its physicians, which were valid contracts, (FAC ¶ 94); (ii) "Defendants, and each of them" knew of the Employment Agreements, (FAC ¶ 97);

and (iii) "Defendants have intentionally induced SAC physicians to wrongfully give notice of termination and not to perform their contracts with SAC[,]" (FAC ¶ 98).

58.     Cone Health argues that Plaintiffs have failed to allege facts supporting their conclusory allegations that Cone Health induced certain of the SAC Physicians to breach their Employment Agreements with SAC. (Br. Supp. 12.) The Court agrees.

59.     Except as to two of the SAC Physicians discussed below, the First Amended Complaint's allegations pertaining to Cone Health's inducement of breaches of the Employment Agreements are: (i) that Defendants engaged in a "collusive conspiracy" to "cause[] a collective cessation of employment by the [SAC Physicians]" that proved successful, (FAC ¶ 40); and (ii) "Defendants have intentionally induced SAC Physicians to wrongfully give notice of termination and not to perform their [Employment Agreements] with SAC[,]" (FAC ¶ 98.) The former allegation merely links Cone Health's alleged inducement to the Defendants' purported conspiracy but states no facts supporting inducement. Furthermore, as alleged, Defendants conspired to "cause" the cessation of the SAC Physicians' Employment Agreements. Again, a plaintiff does not sufficiently allege inducement by alleging causation in a conclusory fashion. *See KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16. The same is true of Plaintiffs' scattered allegations that Cone Health "assist[ed]" the Individual Defendants and PLLC Defendants "in causing the breaches of the relevant agreements[.]" (FAC ¶ 61, 80; *see also* FAC ¶ 66.) As to the latter allegation, (FAC ¶ 98), this is a bare conclusion "not entitled to a presumption of truth[,]" *Walker v.*

*Sloan*, 137 N.C. App. 387, 392, 529 S.E.2d 236, 241 (2000); *see also Good Hope Hosp.*, 174 N.C. App. at 274, 620 S.E.2d at 880.

60.     Other allegations identified in Plaintiffs' brief in opposition to the Motion simply allege various elements of a tortious interference with contract claim.  (*See* Br. Resp. 8–9 (citing FAC ¶¶ 27 (knowledge), 45 (damages)).)    "[C]onclusory allegations that track the elements of a [tortious interference] claim . . . alone are insufficient to state a legally sufficient claim for" tortious interference.  *Radcliffe v. Avenel Homeowners Ass'n*, 248 N.C. App. 541, 572, 789 S.E.2d 893, 913 (2016).

61.     The First Amended Complaint contains slightly more specific allegations as to Cone Health's alleged interference with the Employment Agreements of Dr. Allan and Dr. Guidetti.  Plaintiffs allege that, in November 2017, "Cone Health permitted Drs. Allan and Guidetti to work at Cone Health facilities[,]" and, after being informed by SAC that Cone Health had breached the Cone Health Agreement, "demanded" that Dr. Allan and Dr. Guidetti "obtain from SAC a waiver of their" respective Non-Competition Covenants "in order to continue to work at" Cone Health's facilities.  (FAC ¶ 67.)

62.     Though more specific than Plaintiffs' allegations about the breaches of the other SAC Physicians' Employment Agreements, the allegations concerning Dr. Allan and Dr. Guidetti do not state facts showing that Cone Health induced them to breach their Employment Agreements.    Rather, Plaintiffs allege that Cone Health "permitted[,]" not induced, "Drs. Allan and Guidetti to work at Cone Health facilities[,]" in violation of their respective Non-Competition Covenants.  (FAC ¶ 67.)

This allegation is insufficient to allege inducement. *See Charah*, 2019 NCBC LEXIS 18, at \*18–19 (concluding that defendant's "mere failure to terminate" the employment of an employee bound by a covenant not to compete with his former employer, "without more, does not equate to the sort of purposeful conduct or active persuasion necessary for inducement" (internal quotation marks omitted)). Moreover, Plaintiffs' allegation that Cone Health demanded that Dr. Allan and Dr. Guidetti obtain a waiver of their respective Non-Competition Covenants suggests that, rather than inducing these doctors to breach their Employment Agreements, Cone Health took action designed to prevent or eliminate a breach.

63. The Court therefore concludes that Plaintiffs have failed to allege a claim for tortious interference with contract against Cone Health. The Motion should be, and is, GRANTED as to this claim.

### 3. Prospective Business Relationships/Economic Advantage

64. Plaintiffs allege that Cone Health tortiously interfered with SAC's prospective business relationships with approximately fifty Replacement Anesthesiologists submitted for credentialing to Cone Health by rejecting SAC's proposed staffing plan and refusing to consider the Replacement Anesthesiologists for credentialing. (FAC ¶ 99; *see* FAC ¶¶ 49–67.)

65. "An action for tortious interference with prospective economic advantage is based on conduct by the defendant[] which prevents the plaintiff[] from entering into a contract with a third party." *Walker*, 137 N.C. App. at 392–93, 529 S.E.2d at 241 (citing *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644

(1992)). To state a claim for tortious interference with prospective economic advantage, "the plaintiffs must allege facts to show that the defendant[] acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Radcliffe*, 248 N.C. App. at 567, 789 S.E.2d at 911.

66. Cone Health argues that Plaintiffs' claim for tortious interference with prospective business relationships should be dismissed because "Plaintiffs have failed to identify any prospective clients, customers, or contracts lost, which is fatal to such a claim." (Br. Supp. 14.) Cone Health is correct that under North Carolina law a claim for tortious interference with prospective business relationships and economic advantage cannot survive a motion to dismiss under Rule 12(b)6) where the plaintiff "fail[s] to identify any particular contract that a third party has been induced to refrain from entering into with [the] [p]laintiff." *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002); *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *70–71 (N.C. Super. Ct. Oct. 21, 2016) (dismissing tortious interference with prospective economic advantage claim where plaintiff "failed to identify a particular contract"); *Lund*, 2015 NCBC LEXIS 113, at *31 (same). The First Amended Complaint, however, satisfies this requirement. Plaintiffs identify approximately fifty anesthesiologists, the Replacement Anesthesiologists, for whom "there was a reasonable probability that SAC would have entered into . . . new employment relationships" similar, if not largely identical, to the Employment Agreements. (FAC ¶¶ 60, 99.) The Court deems these allegations

sufficient to identify the particular prospective contracts in question and survive a motion to dismiss under Rule 12(b)(6).

67. However, this conclusion does not save Plaintiffs' claim because, as with their claim for tortious interference with contract claims, Plaintiffs have not adequately alleged inducement. *See Radcliffe*, 248 N.C. App. at 567, 789 S.E.2d at 911 ("[P]laintiffs must allege facts to show that the defendant[] acted without justification in *inducing* a third party to refrain from entering into a contract with them[.]" (emphasis added)). Rather, Plaintiffs allege that Cone Health refused to consider credentialing the Replacement Anesthesiologists or to accept SAC's proposed staffing plan, thus preventing *SAC* from being able to secure these prospective business relationships. (*See* FAC ¶¶ 49–67.) Cone Health's actions, as alleged, were directed toward SAC, not the Replacement Anesthesiologists. Furthermore, these actions do not rise above merely causing SAC's inability to enter into new employment agreements. Such is not enough. *See KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16–17.

68. Plaintiffs have therefore failed to sufficiently allege that Cone Health induced the Replacement Anesthesiologists not to enter into employment contracts with SAC. *See Radcliffe*, 248 N.C. App. at 567, 789 S.E.2d at 911; *KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16–17. Accordingly, the Court concludes that the Motion should be, and is, GRANTED to the extent it seeks dismissal of Plaintiffs' claim for tortious interference with prospective business relationships and economic advantage.

69. In sum, having considered each portion of Plaintiffs' tortious interference claim against Cone Health separately, the Court concludes that the claime should be dismissed in its entirety. "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). Because this claim fails as to Cone Health due to factual insufficiency, the Court concludes, in its discretion, that the claim should be dismissed without prejudice.

## C.  Civil Conspiracy

70. It is well-established that North Carolina law does not recognize an "independent cause of action for civil conspiracy." *Sellers v. Morton*, 191 N.C. App. 75, 83, 661 S.E.2d 915, 922 (2008) (citation and quotation marks omitted); *see also Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) ("The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." (citing *Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 773–74 (1966))). Rather, "[o]nly where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Sellers*, 191 N.C. App. at 83, 661 S.E.2d at 922 (citation and quotation marks omitted).

71. Therefore, under North Carolina law, "a complaint sufficiently states a claim for civil conspiracy when it alleges (1) a conspiracy, (2) wrongful acts done by

certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Krawiec*, 370 N.C. at 614, 811 S.E.2d at 550–51.

72.     Cone Health argues that Plaintiffs' civil conspiracy claim should be dismissed because Plaintiffs' tortious interference claim should be dismissed and the conspiracy claim is premised on Defendants' alleged tortious interference with Plaintiffs' agreements and prospective business relationships.  (Br. Supp. 19; Reply 10.)  While it is true that civil conspiracy is not a standalone claim and requires a separate "underlying claim for unlawful conduct," *Sellers*, 1919 N.C. App. at 83, 661 S.E.2d at 922 (internal quotation marks omitted), and an "overt act" in furtherance of the conspiracy's objective, *Shope*, 268 N.C. at 405, 150 S.E.2d at 774 (quotation marks omitted), the dismissal of Plaintiffs' tortious interference claim against Cone Health "does not bar [Cone Health] from liability for damages resulting from the [acts] of other conspirator[s]"—the Individual Defendants and the PLLC Defendants, *Chisum v. MacDonald*, 2018 NCBC LEXIS 34, at *32 (N.C. Super. Ct. Apr. 18, 2018).  A claim for civil conspiracy requires only that the "overt act [be] committed *by one or more of the conspirators* pursuant to the scheme and in furtherance of the objective." *Shope*, 268 N.C. at 405, 774 S.E.2d at 774 (quotation marks omitted).  The First Amended Complaint asserts claims for tortious interference against the Individual Defendants and the PLLC Defendants, and none of these Defendants has moved to dismiss these claims.  Accordingly, if Plaintiffs have sufficiently alleged the other elements of their civil conspiracy claim, the claim should not be dismissed as to Cone Health simply because the Court has concluded that Plaintiffs have not sufficiently

alleged that *Cone Health* tortiously interfered with the relevant agreements and Plaintiffs' prospective business relationships. *See Chisum*, 2018 NCBC LEXIS 34, at *32.

73. Cone Health also argues that the civil conspiracy claim should be dismissed because the First Amended Complaint does not sufficiently allege, beyond conclusory allegations, an agreement between Cone Health and any of the other Defendants (Reply 10–11). This Court has recognized that "it is difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *48 (N.C. Super. Ct. Apr. 23, 2015). Nevertheless, a "threshold requirement" of a civil conspiracy claim is that a conspiracy existed, which requires "an agreement between two or more persons." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609, 659 S.E.2d 442, 449 (2008) (quotation marks omitted). Where the complaint states that the defendants conspired "but fails to allege how th[e] conspiracy came to be, or when, or where, or why[,]" dismissal is proper. *Bottom v. Bailey*, 238 N.C. App. 202, 213, 767 S.E.2d 883, 890 (2014).

74. Apart from allegations that the Individual Defendants and PLLC Defendants acted to interfere with the relevant agreements and "oust SAC from the local marketplace" with Cone Health's "complicity and collusion" or "assistance" (FAC ¶¶ 45, 66, 91), the only allegations that Cone Health agreed to conspire with the other Defendants are that Cone Health "joined the conspiracy" with the other Defendants "at some time prior to October 23, 2017," (FAC ¶¶ 61, 80). In the First

Amended Complaint, the allegation that Cone Health joined the conspiracy at some time prior to October 23, 2017, (FAC ¶ 61), follows the several allegations relating to SAC's and Cone Health's negotiations over SAC's proposed staffing plan, (*see* FAC ¶¶ 49–60). Indeed, even construing the First Amended Complaint liberally, in the context of these allegations, Plaintiffs' assertion that Cone Health joined the conspiracy, appears to be more a product of a questionable abductive inference— based on allegations having no bearing on how or whether the agreement was reached—rather than a well-pleaded factual allegation. In the Court's view, even at this stage of the proceedings, this inference is not one the Court is obligated to, or should, accept. *Good Hope Hosp.*, 174 N.C. App. at 274, 620 S.E.2d at 880. The remaining allegations of an agreement, taken in context, amount to "nothing more than a suspicion or conjecture" that Cone Health reached an agreement with the other Defendants to conspire to tortiously interfere with the relevant agreements and drive SAC from the local marketplace. *S.N.R. Mgmt.*, 189 N.C. App. at 609, 659 S.E.2d at 449; *see also Bottom*, 238 N.C. App. at 213, 767 S.E.2d at 890.

75. Accordingly, the Court concludes that Plaintiffs' claim for civil conspiracy against Cone Health should be dismissed for failure to sufficiently allege an agreement between Cone Health and the other Defendants. The Motion therefore should be, and is, GRANTED as to this claim. However, for the reasons applicable to Plaintiffs' tortious interference claim, the Court concludes, in its discretion, that this

claim should be dismissed without prejudice. *See Aldridge*, 230 N.C. App. at 191, 749 S.E.2d at 292.

## V.  CONCLUSION

76.  **THEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

**A.** The Motion is **DENIED** as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

**B.** The Motion is **GRANTED** as to Plaintiffs' claim for tortious interference with contract, prospective business relationships, and prospective economic advantage against Cone Health, and this claim is **DISMISSED without prejudice**.

**C.** The Motion is **GRANTED** as to Plaintiffs' claim for civil conspiracy against Cone Health, and this claim is **DISMISSED without prejudice**.

**SO ORDERED**, this the 20th day of August, 2019.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases